# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

GREGORY WINES,

        Defendant-Appellant.

FOR PUBLICATION
March 8, 2018
9:15 a.m.

No. 336550
Kent Circuit Court
LC No. 93-064278-FC

Before: MARKEY, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

In 1994, defendant was convicted of first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, and kidnapping, MCL 750.349. Though a minor, he was sentenced to life imprisonment without parole for the first-degree murder conviction, to be served concurrently with sentences of life imprisonment for the armed robbery and kidnapping convictions. Following the United States Supreme Court decision in *Montgomery v Louisiana*, ___ US ___; 136 S Ct 718; 193 L Ed 2d 599 (2016), in which it held that *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), is to be applied retroactively, defendant was scheduled to be resentenced. He was resentenced on December 9, 2016 to a term of 40 to 60 years. For the reasons set forth below, we vacate his sentence for first degree murder and remand for resentencing on that charge.

## I. *MILLER*, *MONTGOMERY*, AND MCL 769.25A

The Supreme Court decided *Miller* in 2012, but its opinion did not state whether that decision was to be applied retroactively. In 2016, the Court decided *Montgomery*, holding that *Miller* was retroactive. In 2014, after the *Miller* decision, but before *Montgomery*, the Michigan Legislature passed MCL 769.25a, adopting sentencing provisions to come into effect in the event that *Miller* was held to apply retroactively. This statute provides that prosecutors may seek a re-imposition of life without parole imprisonment, if they file a motion within a defined period of time. It goes on to provide in pertinent part that:

> If the prosecuting attorney does not file a motion under subdivision (b), the court shall sentence the individual to a term of imprisonment for which the maximum term shall be 60 years and the minimum term shall be not less than 25 years or more than 40 years. . . . [MCL 769.25a (4)(c).]

-1-

The statute does not define any special considerations to be applied at resentencing. However, in *Miller*, the United States Supreme Court discussed differences between minors[1] and adults relevant to sentencing:

> *Roper*[2] and *Graham*[3] establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, they are less deserving of the most severe punishments. Those cases relied on three significant gaps between juveniles and adults. First, children have a lack of maturity and an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited control over their environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]. [*Miller*, 567 US at 471 (quotation marks and citations omitted).]

In *People v Garay*, 320 Mich App 29, 50; 903 NW2d 883 (2017), we held that in deciding whether a minor should be sentenced to life without parole, a sentencing judge must make the decision based upon these factors. We held that it was an error of law for the judge to rely on broader sentencing goals such as rehabilitation, punishment, deterrence, and protection. *Id*. at 46-48. This was consistent with the *Miller* court's conclusion that typical sentencing considerations such as retribution and deterrence are uniquely altered when the defendant is a minor:

> Because [t]he heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. Nor can deterrence do the work in this context because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. [*Miller*, 567 US at 472 (quotation marks and citations omitted).]

In the instant case, we face the question whether, and if so how, *Miller* applies to the sentencing of a minor for first degree murder when the prosecution does not seek a sentence of life without parole. Defendant argues that the *Miller* standards should govern his sentencing even when the prosecution does not seek a life-without-parole sentence and therefore, that the trial court erred by considering causes that *Miller* holds should not be considered, and by failing to consider the factors that *Miller* articulated. Defendant does not indicate whether he contends that *Garay* should be applied to such cases; thereby, focusing on the *Miller* factors to the exclusion of other

---

[1] *Miller* uses the term "juvenile" to apply to all defendants who were under 18 at the time of their offense. We use the term "minor" in this opinion in order to make clear that the relevant age is 18.

[2] *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

[3] *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

considerations such as punishment and protection. At a minimum, however, defendant argues that the trial court's overriding concern should be the factors defined in *Miller*.

The prosecution responds that the holding in *Miller* was a narrow one, i.e., a term of life without parole may not automatically be imposed on a minor and that for such a sentence to be imposed, the sentencing judge must undertake the specific inquiry defined in *Miller*. We agree with the prosecution that the constitutional holding in *Miller* applied only in life-without-parole decisions, and does not constitutionally compel a sentencing judge to consider only the factors defined in *Miller* when the sentence of life-without-parole is not sought by the prosecution per MCL 769.25a.

We disagree with the prosecution, however, to the degree that it argues that because *Miller's* constitutional holding is limited, the Supreme Court's opinion has *no* application to these sentencing decisions. The prosecution offers no legal or precedential support to conclude that the attributes of youth, such as those described in *Miller*, should be considered only when the sentence of life without parole is sought.[4]

The range of potential minimum terms under MCL 769.25a is very substantial, from 25 years to 40 years. There are no sentencing guidelines to guide a trial court's exercise of discretion within that very substantial range.[5] A defendant sentenced to the lesser of these possible terms chosen will allow a 17 year old to seek parole consideration when he is 42 years old; the latter minimum sentence prevents parole consideration until 57. And since release at a first parole date is by no means assured, and inmate life expectancy is statistically low,[6] the latter sentence virtually assures that the defendant will not be released until he is geriatric, while the former sentence would allow a defendant to be released at an age when reentry into broader society is likely.

---

[4] See *State v. Null*, 836 NW2d 41, 71 (Iowa, 2013) ("Certainly the notions that juveniles have less-developed judgment, that juveniles are more susceptible to peer pressure, and that juveniles' characters are not fully formed applies to this and any other case involving a juvenile defendant. Thus, the notions in *Roper, Graham*, and *Miller* that "children are different" and that they are categorically less culpable than adult offenders apply as fully in this case as in any other.").

[5] The crime of first-degree murder is not addressed by the guidelines. We reject the argument that the minimum sentence range of 25 to 40 years represents a "guideline." The statute's text contains no language suggesting it is an addendum to the sentencing guidelines, and contains no mechanism to score objective factors. It is a legislatively defined minimum sentencing range, but not one that resembles the methods, purpose, or objectivity of the guidelines.

[6] " 'The United States Sentencing Commission Preliminary Quarterly Data Report" (through June 30, 2012) indicates that a person held in a general prison population has a life expectancy of about 64 years. This estimate probably overstates the average life expectancy for minors committed to prison for lengthy terms.' " *People v. Sanders*, 2016 IL App (Ist) 121732-b, ¶ 26; 56 NE3d 563, 571 (2016). See also, Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, American Journal of Public Health, Vol 103, No. 3, p523 (March 2013), which concluded that "for each year in prison, a person could expect to lose approximately 2 years of life."

Further, consideration of these characteristics is in harmony with Michigan's long-established sentencing aims. The objectives generally relevant to sentencing were first articulated by the Michigan Supreme Court in *People v. Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972), and have been often reiterated by our Courts. In *Snow*, the Court explained that in imposing sentence, the court should "balance" the following objectives: "(1) reformation of the offender, (2) protection of society, (3) punishment of the offender, and (4) deterrence of others from committing like offenses." *Id.* (citation omitted). The process of properly balancing these objectives in the case of a minor defendant necessitates consideration of the distinctive attributes of youth. For example, consideration of what the Supreme Court described as youth's "diminished culpability and greater prospects for reform," *Miller*, 567 US at 471, relates directly to *Snow*'s consideration of reformation and the protection of society. Similarly, the Supreme Court's reference to the "diminish[ed] … penological justifications for imposing the harshest sentence on juvenile offenders," *Id*. at 472, correlates with *Snow*'s inclusion of punishment and deterrence as relevant factors in a sentencing calculus. Taking the distinctive attributes of youth into account is consistent with both Michigan's long-stated sentencing objectives and the United States Supreme Court's judgment that "youth matters."[7] We conclude that a failure to consider the distinctive attributes of youth, such as those discussed in *Miller*, when sentencing a minor to a term of years pursuant to MCL 769.25a, so undermines a sentencing judge's exercise of his or her discretion as to constitute reversible error.

In sum, we conclude that there is no *constitutional* mandate requiring the trial court to specifically make findings as to the *Miller* factors except in the context of a decision whether or not to impose life without parole. We further conclude when sentencing a minor convicted of first degree murder, when the sentence of life-without-parole is not at issue, the court should be guided by a balancing of the *Snow* objectives and in that context is required to take into account the attributes of youth such as those described in *Miller*.

## II. FACTS AND APPLICATION OF LAW

When defendant was 17 years old, he was without a home, and began staying in a camper in the backyard of a 14-year-old girl named Jennifer. Another 16-year-old boy, Steven Launsburry, was staying in the camper. Defendant became romantically involved with Jennifer. The feelings, such as they were, were mutual and the two engaged in sexual relations. Jennifer's mother discovered them in bed together and went to the police. Defendant was questioned by a detective and admitted to having consensual sex with Jennifer. Launsburry was also questioned as he had also had sexual relations with Jennifer.

Launsburry and defendant concluded that they had to leave town, and Jennifer agreed to go with them. According to Jennifer, it was Launsburry's idea that they leave town. Later that day, the two boys were at the home of a friend who observed that Launsburry appeared to be "in charge" and "calling the shots." At some point, Launsburry showed off some bullets that he had with him. Later, Launsburry called a friend who picked the two boys up. Launsburry asked to borrow a gun for a few minutes to have with him while he made a marijuana purchase. The friend gave Launsburry his gun, dropped the two boys off, and waited for them to return. They never did.

---

[7] *Miller* at 567 US at 482.

The two boys decided to steal a car parked in the neighborhood but were caught by the owner and ran off. At that point, they made a decision to hijack a car by flagging down a passing vehicle. Launsburry told defendant that the only way they could get away with the carjacking "is to kill him." Defendant asked "who?" and Launsburry answered, "Whoever [is] driving." Defendant asked, "Couldn't we just knock the driver out?"

The next day, Launsburry and defendant attempted to flag down cars and tragically, the victim of this crime, a young woman, stopped to offer them a ride. Launsburry sat in the front seat next to the victim and defendant sat in the back. After a few minutes, Launsburry took out the gun, pointed it at the victim, and directed her to drive to an isolated area. After getting to that area, Launsburry told her to stop the car and get out. Launsburry also got out and directed the victim to an area out of defendant's sight. Defendant heard two shots after which Launsburry returned to the car and told the defendant that he had killed the victim. At no time during this course of events did the defendant attempt to stop Launsburry or warn the victim.

Later that day, Launsburry and defendant picked up Jennifer, who had agreed to run away with them. They drove as far as Indiana and got a hotel room. While Launsburry was sleeping, defendant told Jennifer that Launsburry shot someone and that he was afraid that he killed her. According to Jennifer, defendant was emotionally distraught because he had failed to do anything to stop Launsburry. Jennifer told defendant that they needed to call the police, and he did so. In his phone call, he told the police about the killing, identified their location, and warned them that when they come, they will "need more people because the gun is under [Launsburry's] pillow." When the police arrived and arrested Launsburry, he denied the crime at which time defendant told the police that he could prove that it happened. He showed the police the money that Launsburry took from the victim, and took the police to where Launsburry disposed of the spent shells.

Following his arrest, defendant was charged with first degree felony murder, kidnapping, and armed robbery on the grounds that he aided and abetted Lansbury. He was offered a plea bargain in which he would have pleaded guilty to second degree murder, but he refused to accept it, against the advice of his attorney. He was convicted of all charges and sentenced as described.

Approximately 23 years later, defendant was resentenced. At resentencing, the trial judge imposed the maximum possible term of years, i.e., a term of no less than 40 years and no more than 60 years.

The court's reasoning was based overwhelmingly on the seriousness of the crime and the state's interest in imposing punishment. Undoubtedly, this murder, like virtually all such crimes, was heinous, tragic, and irreversible. However, given that the Legislature has determined that the minimum term may range from 25 to 40 years, the trial court clearly had to exercise its discretion by consideration and balancing of the *Snow* factors. We find that the trial court did not do so. To the contrary, it concluded that defendant should receive the maximum sentence the court could impose because it was defendant's idea to leave town that set the events in motion, and that he participated in a carjacking with Launsburry, whom he knew was armed, and who had expressed the intent to kill the victim. The court concluded, "No matter how one slices the rest of the case, it still comes down to those inexorable facts."

The trial court did not discuss whether defendant remained a threat to the safety of society, whether he was capable of reform, or whether sentencing defendant to 40 years, rather than a lesser minimum term, would be likely to have a significantly different deterrent effect. The court did briefly reference facts relevant to culpability. First, it stated that "Stephen Launsburry, his co-defendant, [is the one] who actually pulled the trigger and is the one directly and personally . . . responsible for the death of [the victim]." The court also noted:

> I agree in part with [defense counsel], certainly the defendant, whatever his chronological age, was psychologically, for lack of a more clinical term, immature. I don't think his thought process was particularly cogent and rational, and in addition to whatever psychological issues he may have had, probably reflects a substandard education and a poorly developed process for logical analysis.

It is difficult to see, however, where or how the trial court factored these factors into his decision when imposing the maximum term he had the authority to impose. Further, the court made no reference to the fact that the day after the crime, defendant called the police, assisted them in locating Launsburry, and confessed to his role in the crimes. Even if the defendant was an adult, such actions would be relevant to his culpability and rehabilitative potential.[8]

Lastly, we note that because defendant has been incarcerated for over 20 years, there was information available to evaluate defendant's rehabilitation, and not merely his potential for rehabilitation. Consideration of defendant's post-sentencing conduct and state of mind is also consistent with the rule that at resentencing, a trial court may consider the defendant's conduct since his original sentencing. See *People v Triplett*, 407 Mich 510, 515-516; 287 NW2d 165 (1980).

The sentencing court had before it defendant's 20-year-old presentence report supplemented with a list of defendant's prison misconducts, some samples of undated positive and negative reviews of defendant's work performance, a list of classes he had taken, and a reference to the fact that he had at one time been a member of a prison gang but that he renounced his membership in 2004.[9] The judge was also provided with a 1986 psychological evaluation of defendant at age 10, and the 1994 psychological evaluation performed upon entry

---

[8] The minimum term imposed does not define defendant's release date. The minimum term imposed by the sentencing judge is the first, not the last, barrier a prisoner faces before release from prison, let alone release from supervision. The minimum term merely sets the date at which defendant may, for the first time, be considered for parole by the parole board.

[9] Defendant entered prison having left school in the 9th grade. During his incarceration he has completed a GED and obtained multiple certifications in various programs. His updated presentence report reveals that from 1994, when he was first incarcerated, through 2003, defendant had several misconducts for angry verbal behavior and several for fighting with other prisoners. From 2004 to 2011, he had no misconducts for anger or fighting. During that 7-year period, he had a total of seven misconducts the two most serious of which was stealing 5 "post-it" note pads and stealing a mop head. From the end of 2011 to the time of resentencing in 2016, he had no misconducts whatsoever.

into the custody of the Department of Corrections (DOC). Other than to note that he reviewed these materials, the court made no reference to any of its content.[10]

## III. DEFENDANT'S SENTENCES FOR KIDNAPPING AND ARMED ROBBERY

At his original sentencing, defendant received sentences of life with the possibility of parole on his convictions of armed robbery and kidnapping. Defendant argues that the trial court erred by refusing to resentence him on these convictions because they now constitute his longest sentences, and was imposed without the preparation or consideration of a sentencing guideline calculation. Defendant's argument that he should be resentenced on those charges does have merit in light of the requirements of MCL 771.14(2)(e)(ii) which provides in relevant part:

> (2) A presentence investigation report prepared under subsection (1) shall include all of the following:
>
> * * *
>
> (e) For a person to be sentenced under the sentencing guidelines set forth in chapter XVII, all of the following:
>
> * * *

---

[10] According to the 1986 report, defendant was referred to a clinical psychologist at age 10 "in order to determine the possibility of a psychotic depression, possibility of hallucinations, [and] reason for excessive anxiety." The psychological report recounted that defendant's mother had a history of drug abuse since age 13 and so, at age 6, defendant was sent to live with his maternal grandmother. The child did not know the whereabouts of his father and feared he might be dead. He was sent for evaluation after "a very severe anxiety attack with an apparent hallucination of his father in a coffin." On IQ testing, he showed "deficits [which] would appear to be most likely the result of some organic or neuropsychological deficit." The examiner noted that "the child was evidently subject to some abuse and neglect as a young child and there is a probability that both parents were abusing drugs during his conception and prenatal life." He found that defendant's anxiety interfered with his reasoning and that his way of dealing with problems was to try to avoid conflict. His diagnoses were major depression, attention deficit disorder without hyperactivity and "developmental disorder characterized by academic retardation."

The DOC psychological evaluation was conducted in 1994. It revealed that defendant returned to his mother's custody at age 14. The examiner noted that defendant likely had a learning difficulty but did not conduct the relevant testing. The personality testing indicated he was the type of "individual who usually expresses his anger in indirect ways . . . and transfer blame onto others." Such men, it noted, "are generally controlled," but "may exhibit occasional periods of impulsivity or aggressiveness." The testing indicated that defendant experienced "a great deal of anxiety when given an unstructured task." The PSIR noted that "prior to the instant offense, the defendant had no history of violent or assaultive behavior." He had been convicted of shoplifting on one occasion.

(ii) Unless otherwise provided in subparagraph (*i*), for each crime having the highest crime class, the sentence grid in part 6 of chapter XVII that contains the recommended minimum sentence range.

However, the scope of the trial court's action and of our review is controlled by the order of the Michigan Supreme Court. In that order, the Court vacated "the sentence of the Kent Circuit Court on the defendant's first-degree murder conviction," and remanded the case to the trial court "for resentencing on that conviction pursuant to MCL 769.25 and MCL 769.25a." Neither the remand order nor the referenced statutes provide for resentencing on his other convictions and so the trial court properly concluded that it had no authority to resentence on those grounds.

Accordingly, we hold that defendant is not entitled to resentencing on those charges in this appeal.

## III. CONCLUSION

We vacate defendant's sentence and remand for resentencing consistent with this opinion. We affirm the trial court's denial of defendant's request for resentencing on his kidnapping and armed robbery convictions. We retain jurisdiction.

/s/ Jane E. Markey
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola

# Court of Appeals, State of Michigan

## ORDER

Jane E. Markey
Presiding Judge

People of MI v Gregory Wines

Docket No.     336550

Douglas B. Shapiro

LC No.     93-064278 FC

Michael F. Gadola
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the trial court shall resentence defendant for the conviction of first degree felony murder. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Jane E. Markey

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

March 8, 2018
Date

Chief Clerk