*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

BENNIE L. LAYTON,

      Defendant-Appellant.

UNPUBLISHED
June 18, 2019

No. 341970
Oakland Circuit Court
LC No. 1996-143720-FC

Before: JANSEN, P.J., and METER and GLEICHER, JJ.

GLEICHER, J. (*dissenting*).

In a quartet of cases commencing with *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and culminating in *Montgomery v Louisiana*, __ US __; 136 S Ct 718; 193 L Ed 2d 599 (2016), the United States Supreme Court established the framework guiding a court sentencing a juvenile convicted of a heinous crime. Youth is a mitigating factor because its "signature qualities," including "impetuousness and recklessness," subside over time. *Roper*, 543 US at 570 (cleaned up).[1] Juveniles have "lessened culpability" due to their "lack of maturity," "underdeveloped sense of responsibility," and susceptibility to the negative influence of peers. *Graham v Florida*, 560 US 48, 68; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (cleaned up). They also have a "greater capacity for change," *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012) (cleaned up), which means that irreversible appraisals of a juvenile offender's potential for rehabilitation violate the Eighth Amendment. See *Graham*, 560 US at 74.

How does a sentencing judge put these precepts into practice when the task is *resentencing*, and the offender to be resentenced is a 40-year-old adult who has spent the

---

[1] This dissent uses the parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

341970/LAYTON

majority of his life in prison? In accord with this Court's opinion in *People v Wines*, 323 Mich App 343, 352; 916 NW2d 855 (2018), lv pending, the majority acknowledges that the judge must consider "the distinctive attributes of youth" when crafting a proportionate sentence. That concept is unassailable, given the logic of *Miller* and *Montgomery*.

Our Legislature made its own proportionality judgment post-*Miller*. A resentencing court must impose a sentence for which "the maximum term shall be 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25a(4)(c). Here, the resentencing court (which had not presided over Layton's 1996 trial) imposed a minimum sentence of 35 years. The court justified this sentence by revisiting the circumstances of the murder, rather than by giving any serious or meaningful consideration to mitigation evidence. I would remand for a resentencing hearing tethered to the precepts articulated in *Miller* and *Montgomery*.

I

In January 1996, James Groppi was shot and killed in a bowling alley parking lot during a robbery. Layton drove the getaway car. The other four occupants of the vehicle accosted Mrs. Groppi as she left the bowling alley and attempted to steal her purse. One struck Mrs. Groppi in the mouth with a handgun. When James Groppi came to his wife's aid, Layton's half-sister, Shameka Jackson, shot him. The robbers ran back to the vehicle and Layton drove away.

The police stopped the car not far from the bowling alley. Layton told the officers that he did not know that the others planned to commit a robbery, although he admitted his awareness that one had a gun. Layton continues to maintain that he did not know that his codefendants intended to committed a crime that evening, and did not realize that Groppi had been killed when he drove the car from the scene. In his 2017 "description of the offense," Layton wrote:

> I didn't know what was happening. I had no idea if they shot at someone or was being shot at. Either way, at that moment I had a choice to make and unfortunately I made the wrong one. One that I've been living with for the past 22 years. Even though I had no knowledge of the crime my co-defendants committed, I still broke the law by driving them away from the crime scene.

The resentencing court began its explanation for the sentence it imposed by rejecting Layton's claim that he was unaware that a robbery had been planned. Based on its review of the trial transcripts, the court determined that Layton "knew that the plan was to go and rob someone." The court continued, "I don't believe that you or maybe anyone else had the plan to kill someone but certainly that resulted . . . in the commission of the robbery that was planned." Based on the way the car was parked, the court continued, Layton must have known that a robbery was contemplated. "There was certainly a plan to rob someone and . . . the fact that now 20 some years later that that still isn't something that . . . is at least acknowledged is troubling to me," the court declared.

The court then shifted its focus to Layton's juvenile record, which included a 1992 conviction for receiving and concealing, additional charges in 1993 including assault and battery, carrying a concealed weapon, and another receiving and concealing offense, and confinement in

juvenile facilities on at least two different occasions. "I certainly don't place you in the same category as a 15 year old that didn't have anything on his record," the court continued.

Layton's institutional record also troubled the court. "I counted every single misconduct individually," the court disclosed, and totaled them at 112. Many were for minor offenses, but some involved destruction of property, gambling, possession of forged documents, and other serious crimes. Some of the misconducts occurred in 2017, at a time when Layton knew he was going to be resentenced.

The court stated that consideration of the *Miller* factors was not "mandatory," but claimed that it "look[ed] at them" nonetheless. In my view, the court's explanation for Layton's sentence belies that it *applied* the teachings of *Miller*:

> Certainly the circumstances of the offense . . . couldn't have occurred without you driving everyone there. I think you indicated at some point or I read something that indicated you were the only one with a license of the group, so they certainly wouldn't - - or if they did drive they wouldn't have been driving legally - - but you drove everyone there and you certainly helped everyone escape. So it certainly could not have occurred without your assistance . . . . I don't buy the statements of not knowing what was occurring or what was going to occur. You went there with everyone else knowing that a robbery was going to occur. That's what was planned. You were going to jump someone[;] it just happened to be Mr. and Mrs. Groppi that night.
>
> In terms of your age, your brother who was 15 was sentenced through the juvenile system . . . and there's a big difference between the 15 year old that your brother was and the 17 year old and one month old that you were . . . certainly with your past criminal history and contacts with law enforcement and the juvenile system . . . I don't consider you the same as that 15 year old and you certainly shouldn't be considered the same.
>
> I did go through the psychological evaluation. I did note that in reviewing the file there was no known mental issues at the time you committed the offense. There was no notation of any mental issues at that time . . . . I do make note that you were diagnosed in July of 2017 with being bipolar . . . and I do make a notation that you . . . sought psychological services starting in 2005 . . . . I've looked at what your attorney provided in terms of your family and your home environment in terms of your father and . . . his role in your life and in your family's life. I do look at the potential for rehabilitation as I indicated you have a juvenile history that started at age . . . 13 and you were in juvenile custody up until one month before this incident . . . . [C]ertainly that gives me some information . . . as well as your institutional history and your lengthy misconduct history.
>
> . . . I also have to look at the deterrence element and part of sentencing . . . whatever sentencing it is and whatever factors you're lookin' at, there is a deterrence element, there is a punishment element, there is an element of

protection of society. So far all the reasons I've indicated and everything that I have reviewed, certainly I wasn't there for this trial but I have certainly done everything I can to review everything possible including the trial transcripts to know everything there is to know and having considered everything that I've looked at - - I also take into consideration your role in this offense as compared to the role of the other offenders in this offense and I know and take into consideration that certainly even though you were not . . . the person that fired the gun obviously you were convicted and under an aiding and abetting theory you're treated the same in the sense that you are responsible for all those actions as well. But I do know and I do take into account the participation and the actions of all the other Defendants . . . compared to you - - your participation and your actions in fashioning this sentence.

This elucidation of the information the court used in resentencing Layton demonstrates that the court concentrated on the components of his culpability rather than examining the mitigating factors of youth. While the court was entitled to conclude that Layton knew that an armed robbery was planned and assisted by driving the getaway car, those determinations do not answer the questions about Layton that should be asked. Layton's guilt for a terrible crime is a given—that is why he was convicted of felony murder and sentenced to life without parole. And the court's narrow and negative interpretation of a much fuller record omits facts that *are* relevant to the *Miller* inquiry.

II

In *Miller*, 567 US at 476 (cleaned up), the Supreme Court observed that youth "is a time of immaturity, irresponsibility, impetuousness, and recklessness. It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage. And its signature qualities are all transient." The Court summarized that the "hallmark features" of youth, now known as the *Miller* factors, include "immaturity, impetuosity, and failure to appreciate risks and consequences," "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional," "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him," that a youthful offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." and "the possibility of rehabilitation[.]" *Id*. at 477-478.

Layton's resentencing counsel prepared a lengthy sentencing memorandum discussing the crime, Layton's family history, his prison record, and the report of a psychologist who examined Layton in anticipation of the resentencing. The presentence investigation report submitted by the probation department contains some of the same information. These sources provide mitigation evidence that the resentencing court ignored.

Layton grew up in an abusive home. His father, an alcoholic, often severely beat Layton and his siblings with his fists, a belt, and other implements. Layton saw his father hit his mother, knocking her down. As a child, Layton stayed away from his home as much as possible to avoid

-4-

his father's unpredictable rages. His younger half-brother, a coparticipant in the killing of James Groppi, became a state ward and accrued two more felonies as an adult.

Layton finished only the seventh grade. In distancing himself from his home environment, he befriended older teenagers and joined them in criminal activities. As the resentencing court recited, Layton was prosecuted for receiving and concealing stolen property, joy-riding, and falsifying documents. He was housed in the Maxey Boys' Training School from age 15 to age 17. There he obtained his GED, qualified as a life guard, and enrolled in a Delta Community College program scheduled to begin just days after the robbery. After his release from Maxey and while back at home with his siblings and dysfunctional family, Layton reentered the world of crime.

Layton aided and abetted a murder, rather than planning or executing it. Even assuming that he knew an armed robbery was planned, no evidence supports that he anticipated that someone would die. See *Graham*, 560 U S at 69 ("[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability."). And although Layton's incarceration history is pertinent and distressing, its creation is not as one-dimensional as the resentencing court's portrayal suggests.

As the resentencing court noted, Layton accumulated numerous misconduct citations during the 22 years he has spent in prison. The aspect of Layton's prison history that the court ignored is equally powerful. While in custody, Layton was transferred 14 times. Due to his youth, he was frequently bullied and sexually harassed by other prisoners. At his request, he was placed in administrative segregation more than once. During those periods Layton did well, garnering praise from prison officials. By 2014, his security classification had decreased to Level II, the lowest possible for an inmate serving a term of life without parole.

The psychological assessment performed at his counsel's request helps to explain Layton's difficulty in conducting himself appropriately in the general prison population. After years of depression and suicidal ideation for which Layton repeatedly and unsuccessfully sought treatment, Layton's psychiatric problems were finally addressed. When he was placed in a Residential Treatment Program and received regular therapy, Layton did not earn any misconducts. Unfortunately, Layton was removed from that program because he was attacked by other participants.

In June 2017, Layton was diagnosed with a bipolar disorder and placed on antipsychotic medications. Initially, he took the medication only inconsistently. He began a new medication on October 2017, and has functioned well since then. The psychologist who recently evaluated him opined that Layton needs consistent psychiatric treatment and will continue to need treatment when he is paroled.

III

The principles that guide proportional sentencing in our state are: "(a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses." *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972). *Roper*, *Graham*, *Miller*, and *Montgomery* instruct that the proportionality

equation must incorporate additional tenets when a court sentences a juvenile convicted of murder.

Children are different for several reasons relevant to proportionality. Because a juvenile's character and identity are not well formed, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Roper*, 543 US at 570. This means that the penological goal of "discipline" or retribution must be assessed differently when sentencing a child, or resentencing an adult whose crime was committed as a juvenile. "The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult." *Id*. (cleaned up). A child's "vulnerability and comparative lack of control" over a situation "mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Id*.

> *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. [*Miller*, 567 US at 472, (cleaned up).]

A resentencing court must do more than merely *acknowledge* an offender's youth at the time his crime was committed. *Miller* requires that a court *apply* the core principles that guided that decision.

When a resentencing court fails to consider the *Snow* factors through the lens of *Miller* and *Montgomery*, it abuses its discretion. And that is precisely what happened here. Although the resentencing court begrudgingly acknowledged Layton's youth, it made no effort to apply the *Miller* factors. Instead, the court retried the underlying case, reconfirmed Layton's guilt, and resentenced him based primarily on his conduct at that time.

The resentencing court failed to understand or recognize that Layton's culpability for the crime was mitigated by his youth, and that he aided and abetted the shooting rather than acting as a principal. The resentencing court "made note" of Layton's abusive childhood and its consequences, but these factors never entered its sentencing equation. Nor did the court grapple with the effect of Layton's psychiatric illness on his conduct in prison, or acknowledge that despite his illness, Layton managed to achieve a low security status. The court made no mention of any of the positive aspects of Layton's life, including his completion of multiple prison programs and his steady employment in various areas of various prisons. Nor did the court substantively address the non-*Miller* considerations—protection of society and deterrence.

The resentencing court's focus on the circumstances surrounding the crime perverts the proportionality review mandated by Michigan law, *Miller*, and *Montgomery*. Given the Legislature's identification of a minimum sentencing range of 25 to 40 years, I believe a sentence of 35 years is grossly disproportionate. The resentencing court's analysis failed to take into account the characteristics of Layton's life at the time he committed the crime, and the

circumstances of his imprisonment. I would remand for resentencing guided by the proportionality principles governing resentencing in this state, as modified by *Miller*.


/s/ Elizabeth L. Gleicher