*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 25, 2019

Plaintiff-Appellee,

v

No. 343987
Saginaw Circuit Court
LC No. 99-017628-FC

JAMES WASHINGTON, III,

Defendant-Appellant.

Before: O'BRIEN, P.J., and FORT HOOD and CAMERON, JJ.

PER CURIAM.

In 2000, defendant was convicted by a jury of first-degree premeditated murder, MCL 750.316(1)(a), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227(b)(1). Defendant—who was a juvenile at the time—was sentenced to life in prison without parole for the murder and two years' imprisonment for the felony-firearm conviction. Following *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012) (which held that imposing mandatory life-without-parole sentences on juvenile offenders violates the Eighth Amendment) and *Montgomery v Louisiana*, ___ US ___; 136 S Ct 718; 193 L Ed 2d 599 (2016) (which held that *Miller* applies retroactively) the Michigan Supreme Court vacated defendant's sentence for life without parole, and remanded to the trial court for resentencing. *People v Washington*, 499 Mich 909 (2016). On remand, the trial court sentenced defendant under MCL 769.25a to 40 to 60 years' imprisonment for his murder conviction. We affirm.

## I. BACKGROUND

At defendant's resentencing hearing, the trial court described the events that led to defendant's conviction as follows:

This homicide was a premeditated execution-style killing over a drug debt. Defendant was a drug dealer at the time of the murder, and the victim was a customer who allegedly owed defendant money.

-1-

In the late hours of June 26, 1999, two 13-year-old boys were visiting defendant who supplied them with drugs and alcohol. In the hours leading up to the murder, defendant asked his younger visitors if they wanted to see someone get shot and killed. Later on, as the two boys were sleeping, defendant woke them up and told them it was time for the killing.

The defendant then lured the victim and another adult male, [Robert] Corcoran, to his home under the guise of a drug transaction. When the two men arrived in the defendant's driveway, the defendant directed them into the back yard. Defendant then turned back to his younger friends and asked if they were ready. After that, the defendant pulled a gun from his waistband and pulled the trigger. The gun initially misfired, but defendant pulled the trigger again and shot [the victim] in the head.

After [the victim] fell to the ground, the defendant walked over and shot him again. He later told his younger companions, that is how you kill someone. . . . .

Defendant then ordered Corcoran to move [the victim's] body. Corcoran grabbed [the victim's] legs and pulled him into an area of flowers and shrubs, partially concealing [the victim's] body. Defendant took Corcoran's identification, told Corcoran that he knew where he lived, and that the same thing would happen to him if he told anyone about the murder.

The defendant then yelled for his neighbor, [Steve] Smith, because he wanted Smith to help him dispose of [the victim's] body. A Buick, driven by Beauford Adkins, a relative of the defendant's, backed into defendant's driveway. Defendant, Smith, and Adkins wrapped [the victim's] body in a sleeping bag and blanket and loaded it into the trunk. Adkins and Smith drove to a rural area in Gladwin County, where they left [the victim's] body in the woods.

Corcoran later called the police and reported that he had witnessed a homicide in Saginaw. He explained the reason that so many people were involved was because the defendant was on electronic monitoring and could not leave his residence.

On remand, the trial court heard statements from defendant, his counsel, and the victim's family. Following these statements, the trial court delivered its ruling from the bench. It discussed at length the factors from *Miller* and *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972), and explained how each factor weighed into its decision. After explaining its reasoning, the trial court sentenced defendant to 40 to 60 years' imprisonment for the murder conviction.

Defendant now argues that the trial court failed to correctly apply the *Miller* factors. He maintains that the court only gave minimal consideration to how defendant was affected by his youthfulness at the time of the offense; abused its discretion by relying on information that was

not contained in the lower court record; failed to adequately consider the extent of defendant's rehabilitation; and ultimately imposed a de facto life sentence. We disagree.

## II. STANDARD OF REVIEW

This Court reviews for an abuse of discretion the trial court's decision to sentence defendant under MCL 769.25a to 40 to 60 years' imprisonment. See *People v Skinner*, 502 Mich 89, 131; 917 NW2d 292 (2018). "[A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Id.* at 133 (quotation marks and citation omitted).

## III. *MILLER* AND ITS PROGENY

After *Miller* held mandatory life-without-parole sentences for juvenile offenders to be unconstitutional, but before *Montgomery* declared *Miller* retroactive, our Legislature enacted MCL 769.25a, which was to apply if *Miller* was determined to apply retroactively. See *People v Wiley*, 324 Mich App 130, 137; 919 NW2d 802 (2018). Because *Montgomery* declared *Miller* retroactive, MCL 769.25a applies. That statute sets forth the procedure for resentencing criminal defendants under *Miller* when the case is final. As relevant here, MCL 769.25a allows the trial court to resentence those juvenile offenders originally sentenced to life without parole to a term of years "for which the maximum term shall be 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25a(4)(c).

In *Miller*, the United States Supreme Court held that judges or juries sentencing juvenile offenders "must have the opportunity to consider mitigating circumstances" before sentencing juveniles to a sentence of life without the possibility of parole. *Id.* at 489. In *Skinner*, our Supreme Court enumerated these mitigating factors as follows:

> (1) "his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." [*Skinner*, 502 Mich at 114-115, quoting *Miller*, 567 US at 477-478.]

In *People v Wines*, 323 Mich App 343, 352; 916 NW2d 855 (2018), this Court held that *Miller* "does not constitutionally compel a sentencing judge to consider only the factors defined in *Miller* when the sentence of life imprisonment without parole is not sought by the prosecution per MCL 769.25a," as is the case here. Yet the *Wines* Court held that trial courts must still "consider the distinctive attributes of youth, such as those discussed in *Miller*," when sentencing a defendant to a term of years under MCL 769.25a. *Id.* at 352. The *Wines* Court reasoned that, based on *Snow*, 386 Mich at 592, a sentencing court should balance "(1) reformation of the

offender, (2) protection of society, (3) punishment of the offender, and (4) deterrence of others from committing like offenses," and that these can only be properly balanced "in the case of a [juvenile] defendant" by considering "the distinctive attributes of youth." *Wines*, 323 Mich App at 351-352.

## IV. DEFENDANT'S YOUTHFULNESS

Defendant first argues that the trial court incorrectly applied the *Miller* factors in determining the extent to which defendant was affected by his chronological age and its hallmark features. We disagree.

When sentencing defendant, the trial court reasoned:

> *Miller* instructs the Court to consider the character and record of the individual offender as well as the offender's chronological age at the time of the offense. The defendant here was 17 when he committed this murder. Prior to his 17th birthday, the defendant amassed a significant juvenile justice history, including a 1994 larceny from a person, which resulted in a warning, and two 1996 adjudications for assault with intent to do great bodily harm less than murder. As a result of the assault adjudications, the defendant spent approximately two years in a juvenile detention facility before he was released to his mother's custody in 1998.

> Almost immediately after his 17th birthday, defendant became involved in the adult criminal justice system. On April 25, 1999, he was charged with assault with intent to do great bodily harm, operating under the influence of liquor, minor in possession, driving while license suspended, and having improper plates. The defendant was on electronic monitoring as a condition of his bond in the assault case when he murdered the victim on June 27, 1999.

> Defendant's age at the time of the offense would be a mitigating factor in light of the immaturity, impetuousness, and recklessness often associated with youth. However, there's no evidence that the defendant was immature for his age or that he suffered from a learning disability or emotional impairment. Rather, the record indicates that the defendant was a relatively bright teenager who was able to earn his GED in 1997 while in juvenile placement. Additionally, the Court finds the defendant's significant juvenile justice history and his prior involvement in the adult criminal justice system to be aggravating factors in terms of his sentencing.

Contrary to defendant's position, the trial court appropriately weighed defendant's age and the characteristics that often accompany young age—such as immaturity, impetuousness, and recklessness—when sentencing defendant. The trial court explicitly recognized this mitigating factor and explained, in detail, why the factor did not justify a lower sentence. Defendant appears to argue that *Miller* mandates that a juvenile offender's chronological age and its hallmark features always justify a lower sentence. But that is not what *Miller* held; *Miller* required that sentencing courts "have *the opportunity to consider* mitigating" factors such as the

hallmark features of youth. *Miller*, 567 US at 489 (emphasis added). The trial court had the opportunity to—and did—consider this factor, and decided that it justified a lower sentence in defendant's case. The trial court gave a reasonable and principled explanation for this decision, so we conclude that the trial court did not abuse its discretion. *Skinner*, 502 Mich at 133.[1]

## V. FACTS NOT IN THE RECORD

Next, defendant argues that the trial court abused its discretion when sentencing him because it relied on information that was not in the record and did not provide defendant an opportunity to refute that information.

The portion of defendant's sentencing that he argues was not in the record occurred while the trial court was reciting the factual basis for defendant's conviction. The trial court stated:

> After [the victim] fell to the ground, defendant walked over and shot him again. He later told his younger companions, that is how you kill someone. *By the way, both of these boys went on to be involved in the criminal justice system themselves, one of them for murder.* [Emphasis added.]

Defendant is correct that the italicized portion is not in the record. Yet there is nothing to suggest that the trial court relied on this information when sentencing defendant. Again, the trial court noted this information while it was establishing the factual basis for defendant's conviction, and it appears to be nothing more than an aside. The whole of the trial court's reasoning for defendant's sentence spans 12 pages of transcript. In those 12 pages, the trial court explains the numerous factors that it considered to justify defendant's sentence. There is nothing in those 12 pages to suggest that the trial court considered this information when determining defendant's ultimate sentence. Accordingly, defendant has not established any error warranting resentencing.

## VI. REHABILITATION

Defendant argues that the trial court erred when it resentenced him to a minimum 40-year term for his murder conviction because his self-reformation and rehabilitation during his years of incarceration should have "strongly" mitigated his sentence. We disagree.

The Court acknowledged at length that, since 2007, defendant's behavior in prison was positive:

---

[1] As part of defendant's argument that the trial court abused its discretion by not properly weighing his chronological age, defendant references difficulties he experienced in his family and home environments leading up to the crime. In a different portion of the trial court's oral opinion, it separately considered defendant's family and home environments, and concluded that it was a mitigating factor.

[T]he Court acknowledges that the defendant has shown considerable improvement in his attitude and behavior since 2007, when his mother passed away. After his mother's death, the defendant accepted responsibility for this murder and expressed remorse for his actions.

He has also completed all of his program recommendations in prison, including anger management, behavioral modification, substance abuse, and self-help programs. He has also taken college classes offered through Central Michigan University and Saginaw Valley State University.

He has also become a mentor in two programs, Youth Deterrent and Common Ground. Probation Officers Kila Thomas, Roger Foster, and Barbara Beekman have all provided statements verifying the defendant's positive contributions to the Youth Deterrent program. Daryle Walton has also provided an email detailing defendant's effectiveness as a mentor in both programs.

The defendant also has a solid prison work history. Since 2011, he has received 363 positive work evaluations, and has been assigned as a unit porter. Also, since 2011, he has been consistently housed in Level II, which is the lowest level security that can be achieved by prisoners sentenced to life.

Based on his positive behavior since 2007, the Court is hopeful that the defendant will develop the tools necessary to function as a productive, nonviolent, law-abiding citizen if he is granted the opportunity for parole in the future.

Yet, in spite of his positive behavior since 2007, the trial court expressed reservations about defendant's potential for rehabilitation:

The brutal nature of this offense, the defendant's extensive criminal behavior predating this offense, and his consistent denial of responsibility for this murder for many years after his conviction are all factors that cause the Court concern relative to his potential for rehabilitation.

In addition, the defendant has accrued 12 prison misconducts during his nearly 19 years of incarceration. Defendant's most serious misconducts include assault and battery, fighting, threatening behavior, possession of a weapon, and assault resulting in serious injury to a prisoner.

We disagree with defendant that the trial court "minimiz[ed]" his rehabilitation. To the contrary, the trial court acknowledged defendant's progress at length, noting not only the programs that he has participated in, but the positive impressions that he left on the people running those programs. While defendant would have preferred the trial court to only look at his record since his 2007, the trial court instead reviewed the totality of defendant's prison record, and connected that to the earlier failures to rehabilitate defendant. The trial court thus took a holistic approach to considering defendant's potential for rehabilitation, and found that, when not focusing only on defendant's positive improvements, there was reason for concern. This conclusion was within the range of reasonable and principled decisions, and therefore the trial court did not abuse its discretion. *Skinner*, 502 Mich at 133.

-6-

## VI. DE FACTO LIFE SENTENCE

Lastly, defendant argues that the trial court abused its discretion in sentencing him to 40 to 60 years' imprisonment because, given the reduced life expectancy of prisoners, the sentence amounted to a de facto life sentence. Yet defendant cites no authority, binding or otherwise, for his assertion that a 40-year sentence amounts to a de facto life sentence. And even if he did, defendant does not explain how the trial court's sentence was in error; defendant does not argue that the sentence violates the principle of proportionality, nor does he contend that the sentence violated *Miller*.[2] In short, defendant's argument does not present any ground for relief.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Karen M. Fort Hood
/s/ Thomas C. Cameron

---

[2] Defendant contends that a de facto life sentence would not "meaningfully" apply *Miller* to him because *Miller* requires that a juvenile defendant have "some meaningful opportunity to obtain release . . . ." *Miller*, 567 US at 479 (quotation marks and citation omitted). We note, however, that *Miller* prefaced that statement with, "A state is not required to guarantee eventual freedom[.]" *Id* (quotation marks and citation omitted). This Court recently held that a defendant sentenced to life with the possibility of parole has some meaningful opportunity to obtain release, see *People v Williams*, 326 Mich App 514, 522; 928 NW2d 319 (2018), and we see no reason why defendant's 40 to 60-year sentence does not present the same opportunity.