*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

HUBERT MARTIN MARSHALL,

Defendant-Appellant.

UNPUBLISHED
October 22, 2020

No. 345927
Wayne Circuit Court
LC No. 98-013443-01-FC

Before: BECKERING, P.J., and CAVANAGH and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right from an order reinstating his claim of appeal, his jury trial convictions of second-degree murder, MCL 750.317, assault with intent to rob while armed, MCL 750.89, and felony firearm, MCL 750.227b. Defendant was sentenced to 46 to 70 years for the murder conviction, 5 to 15 years for the robbery conviction, and two years for the firearm conviction. We affirm in part, vacate in part, and remand for resentencing.

## I. BACKGROUND

Defendant's convictions arose from the shooting death of 24-year-old Carl Higginson on November 9, 1998. At the time, defendant was 17 years' old and his codefendant Kumar Hubbert, also known as Kamo, was 16 years' old. Higginson drove into the parking lot of the Southland Apartments in Taylor, Michigan looking for directions. Five people, Jason Cunningham, Donte Kirk, Earl Rhoden, Kamo, and the defendant were engaged in conversation as Higginson asked where someone named Danielle lived. Kamo directed Higginson to a nearby parking lot. Cunningham saw defendant pass Kamo a handgun, say he was going "to get him", and observed Kamo walk in the direction of Higginson's vehicle. Cunningham, Kirk and Rhoden then left the scene by cutting through another apartment building. They heard gunshots which they shrugged off as a normal occurrence in the apartment complex. Both Martina Marchbanks and James Harmer saw two young African-American males, one short and one tall, approach Higginson's vehicle. Marchbanks and Harmer called 911 after they witnessed the taller of the two males raise an arm and shoot into Higginson's vehicle.

On November 10, an anonymous tip and a call from Cunningham led to defendant's and Kamo's arrest. During his interrogation, defendant provided a written statement where he confessed to having shot Higginson by mistake. A search of defendant's bedroom revealed a .25 caliber handgun that the prosecution's firearms expert opined was the same gun responsible for the five spent cartridges at the scene of the shooting. Defendant was charged with felony murder, assault with intent to rob while armed, and felony firearm. Defendant was tried jointly with codefendant Hubbert before separate juries.

On the fourth day of jury deliberations, the court advised the parties that one of the empaneled jurors had called and said that she was having a family emergency, not able to come in, and if the court needed to call her, she would be at home. The court reported that she was queried about the emergency, the juror stated that her father was having chest pains, that she did not know where he was taken, and did not want to leave home. The court asked defendant if he wanted the jury of 11 to continue to deliberate or have a squad car sent for the juror. Defense counsel expressed concern that if brought in, the juror would try to do a "rush job" and asked for a mistrial. The court denied the mistrial. After consulting with his attorney, defendant decided that he wanted 12 jurors. The court called the juror and was informed by her roommate that the juror was out shopping and would be back in an hour. The court informed the roommate that if the juror did not appear before the court by 1:00 p.m., a bench warrant would be issued for her arrest.

The juror appeared as ordered and returned to deliberations. The jury deliberated for 35 more minutes before reaching verdicts of guilty on the lesser included offense of second-degree murder, assault with intent to rob while armed, and felony firearm. Defense counsel again requested a mistrial. He based this request upon the court's failure to inquire about the family emergency and any possible jury taint prior to sending the juror back into deliberations. The court denied the motion after finding that defense counsel chose not to be in court when the juror returned to raise these issues.

Defendant was sentenced on February 14, 2000 and resentenced on February 16, 2000.

The defendant's appellate relief was invitingly denied by this court and the Supreme Court due to timeliness issues. However, on September 21, 2018, defendant's motion to reinstate his appeal of right in the trial court was granted. According to the order of that court,

> Following sentencing, Defendant executed his Notice of Right of Timely Appeal form on February 16, 2000, and sent it to the Court via a letter postmarked on or about February 23, 2000. For whatever reason, the court did not process Defendant's form. Consequently, "it is clear that the failure to perfect an appeal of right is not attributable to the defendant." *People v. Brown*, 500 Mich. 1018, 896 N.W.2d 797 (2017). Accordingly, under MCR 6.428, the court will reissue Defendant's Judgment of Conviction and Sentence.

On appeal, defendant argues that: 1) the trial court abused its discretion when it failed to grant his motion for a mistrial based on a juror's failure to appear for deliberations, and 2) that he is entitled to resentencing where his sentence for second-degree murder was disproportionate, excessive and unconstitutionally cruel and unusual.

## II. REQUEST FOR MISTRIAL

### A. STANDARD OF REVIEW

We review the trial court's decision on defendant's motions for a mistrial and to remove a juror for an abuse of discretion. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995); *People v Tate*, 244 Mich App 553, 559; 624 NW2d 524 (2001). An abuse of discretion occurs when the trial court chooses an outcome outside of the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *People v Ortiz-Kehoe*, 237 Mich App 508, 513-514; 603 NW2d 802 (1999).

For claims that the jury was exposed to an extraneous influence, "[w]e examine the error to determine if it is harmless beyond a reasonable doubt because the error is constitutional in nature." *People v Budzyn*, 456 Mich 77, 89; 566 NW2d 229 (1997).

"Claims of coerced verdicts are reviewed on a case-by-case basis, and all of the facts and circumstances, as well as the particular language used by the trial judge, must be considered." *People v Malone*, 180 Mich App 347, 352; 447 NW2d 157 (1989).

### B. ANALYSIS

Defendant first argues that the trial court erred in denying his motion for a mistrial when a juror failed to appear for deliberations on the morning of January 13. We disagree. "[T]his Court has determined that, while a defendant has a fundamental interest in retaining the composition of the jury as originally chosen, he has an equally fundamental right to have a fair and impartial jury made up of persons able and willing to cooperate, a right that is protected by removing a juror unable or unwilling to cooperate." *People v Tate*, 244 Mich App 553, 562; 624 NW2d 524 (2001). "Removal of a juror under Michigan law is therefore at the discretion of the trial court, weighing a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate." *Id*. "[T]he Michigan Supreme Court has also held that the trial court must exercise its power to declare a mistrial with great caution and employ less drastic alternatives which would be revealed by the scrupulous exercise of judicial discretion." *People v Dry Land Marina, Inc*, 175 Mich App 322, 327; 437 NW2d 391 (1989). "[T]he policy of protecting defendant's right to have its case decided by the jury as chosen is protected by avoiding a mistrial if reasonable alternatives exist." *Id*.

In lieu of granting a mistrial, it was a reasonable alternative to order the juror back to court to continue deliberations. Most importantly the defendant agreed to the remedy after consultation with counsel. While the report that she went shopping casts some doubt on the family emergency, she did obey the court's explicit order to return to court in lieu of a warrant. "A juror is presumed to be qualified and competent." *Froede v Holland Ladder & Mfg Co*, 207 Mich App 127, 130; 523 NW2d 849 (1994). The mere failure to appear earlier that day was not a ground for disqualification. See MCR 600.1307a. ("Temporary inability shall not be considered a disqualification."). Defendant's concerns as to the partiality of the jury after the juror returned were speculative, in that defendant presumed the juror had a certain disposition upon return and

that it infected the other 11 jurors. In any event, defendant was fully informed of and assumed the risks of the juror being ordered back into deliberations.

Defendant next argues that the trial court erred in allowing the juror to continue deliberating without inquiring into her "mental state, the validity of the 'family emergency,' and whether or not the juror had been exposed to extraneous forces[.]" This issue was waived at trial where defense counsel was informed of the time when the juror was to reappear and chose not to return to the court at that time to make inquiry of the juror or, ask the court for a delay if counsel could not appear at that time. Defendant has not cited authority for a claim that the court was required sua sponte to question the juror upon her return. There is otherwise no evidence of record that the juror's ability to serve was impaired by her mental state or the validity of the family emergency.

Defendant argues that there was some extraneous influence that tainted the juror. Specifically he argues that it was unknown whether the juror had learned during her absence from the jury that defendant's codefendant was found guilty. While defendant is correct that there is no record in this regard, his codefendant was convicted by a separate jury on January 7, 2000, the last day of the joint trial. Defendant's jury did not render a verdict until nearly one week later on January 13. Any juror could have potentially learned of the codefendant's verdict within that time and defendant does not explain how this juror's four-hour absence from deliberations (9:00 a.m. to 1:00 p.m.) made her anymore exposed to extraneous influences such that a sua sponte inquiry was required upon her return.

Defendant also argues that the juror was forced to continue deliberations and "[a] speedy, but questionable, verdict then resulted." Defendant implies that the court requiring the juror to continue to deliberate created an atmosphere of coercion that led to an unreliable verdict. However, there was no indication that the juror or the jury as a whole was rushed to a verdict. The jury's multiple notes to the court throughout deliberations indicated that it was independently reviewing the evidence and it was unknown how close the jury was to resolving the charges before the circumstances with this juror arose. Still, defendant states, "We do not know what pressures she may have faced" upon returning to deliberations and that "She could have been one of the holdouts that led to the deadlocked jury." Both of these assertions are speculative. Defendant compares his case to *People v Malone*, 180 Mich App 347, 353; 447 NW2d 157 (1989), where the Court decided that, "[i]n light of the fact that the jury was never told that it could resume deliberations on the following Monday, we believe that the trial court's comments, taken as a whole, at best were confusing and may have improperly communicated by implication that, if a verdict could not be reached that evening, the jury would be considered deadlocked and would be permanently discharged." The court in defendant's case made no comments concerning the length of deliberation and defendant fails to cite any support otherwise for the length of deliberations being evidence of coercion.

Defendant last argues that the trial court's requiring the juror to continue to deliberate resulted in a compromised verdict.

> Provided that in the end all jurors agree beyond a reasonable doubt as to the verdict, there is absolutely no prohibition of a juror changing positions during deliberations. Juror deliberations, however, must be distinguished from juror compromise. When

-4-

jurors give up their beliefs to settle on a common ground with other jurors, who may have also abandoned their convictions in the interest of agreement, a compromise verdict results. When jurors forsake their convictions simply to reach a verdict, the defendant has not been found guilty beyond a reasonable doubt by all members of the jury. [*People v Ramsey*, 422 Mich 500, 515; 375 NW2d 297 (1985)].

Defendant bases his claim that the verdict was compromised on 1) a statement from his sentencing judge that "that this was a compromise verdict," and 2) that the jury had acquitted defendant of the greater charge of felony murder. Concerning the first basis, the trial court's entire statement was, "Now, I know both sides are arguing as to what jurors said or what – you know, this was a compromise verdict, but regardless, that is the definition of Felony Murder . . .". When read in context, the court was clearly referring to what the attorneys' arguments were and not its own ruling or opinion on the case.

Defendant also argues the jury verdict was compromised because the jury acquitted him of felony-murder and convicted him instead of second-degree murder. Jury compromise occurs when some of the jurors agree to convict the defendant on one count, although they did not believe beyond a reasonable doubt that the defendant was guilty of that count, in exchange for the agreement of other jurors to acquit the defendant of another count. *People v Lewis*, 415 Mich 443, 451-452; 330 NW2d 16 (1982). However, "a jury's acquittal on one charge in a multi-count indictment signals no more than the jurors' agreement not to convict on that charge for whatever reason satisfactory to them." *Id*. at 450. Juries "have the power to acquit as a matter of leniency." *Id*. at 449. The jury in defendant's case may have very well intended to grant him leniency in not finding him guilty of felony murder because he was a juvenile at the time of the offense (17 years' old). In this case, the jury was also instructed twice that, "although you should try to reach an agreement, none of you should give up your honest opinion about the case just because the other jurors disagree with you or just for the sake of reaching a verdict." Thus, the jury was given instructions not to compromise and "[i]t is well established that jurors are presumed to follow their instructions." *People v Hana*, 447 Mich 325, 351; 524 NW2d 682 (1994). Also, the jury was polled after its verdict and the juror at issue indicated that was her verdict.

In sum, the trial court did not abuse its discretion in denying defendant's motions for a mistrial where ordering the juror to continue deliberations was within the range of reasonable and principle outcomes.

## III. RESENTENCING

Defendant argues that his sentence for second-degree murder was not proportionate because it did not account for the fact that he was a juvenile and was not supported by the court's factual findings. For the reasons discussed below, we agree that defendant is entitled to resentencing.

## A. STANDARD OF REVIEW

The offenses here occurred in November 1998 which predated the January 1, 1999 enactment of the legislative sentencing guidelines, MCL 777.1 *et seq*. *People v Hegwood*, 465

Mich 432, 434; 636 NW2d 127 (2001). Before the enactment of the legislative sentencing guidelines, appellate courts reviewed sentences under the judicial guidelines for an abuse of discretion. *People v Milbourn*, 435 Mich 630, 635-636; 461 NW2d 1 (1990). Under *Milbourn*, "a given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id.* at 636.

We review unpreserved claims of constitutional error for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

## B. ANALYSIS

Defendant's Michigan Department of Corrections recommended sentencing guidelines range for his second-degree murder conviction was 120 – 300 months. The court departed from that recommendation and sentenced defendant to 552 – 840 months. Defendant first argues that his departure sentence was not proportionate to the offender because the sentencing court did not consider his juvenile status. Defendant argues that under the United States Supreme Court's decisions of *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and *Montgomery v Louisiana*, 577 US __; 136 S Ct 718; 193 L Ed 2d 599 (2016), juvenile offenders are recognized as different from adult offenders. In *Miller*¸ the Court reasoned that because juvenile offenders lacked maturity and had an underdeveloped sense of responsibility, they were less deserving of the most severe punishments. 567 US at 471. The *Miller* Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Id.* at 465. "[T]he Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children[.]" 577 US at ___; 136 S Ct at 726. The *Montgomery* Court held "that *Miller* applie[d] retroactively to juvenile offenders whose convictions and sentences were final when *Miller* was decided because *Miller* announced a new substantive rule by rendering life without parole an unconstitutional penalty for a specific class of juvenile defendants." *People v Skinner*, 502 Mich 89, 106; 917 NW2d 292 (2018). Based on these developments in the law that occurred after defendant's 2000 sentencing, defendant requests resentencing.

Unlike in *Miller* and *Montgomery* where the juvenile defendants were sentenced to life imprisonment without the possibility of parole, defendant Marshall was sentenced to a term of years. In *People v Wines*, this Court held "that there is no *constitutional* mandate requiring the trial court to specifically make findings as to the *Miller* factors except in the context of a decision whether to impose a sentence of life without parole." 323 Mich App 343, 352; 916 NW2d 855 (2018). Thus, defendant's claim that he is constitutionally entitled to resentencing under *Miller* is incorrect. Instead, *Miller* provides that "when the sentence of life imprisonment without parole is not at issue, the [sentencing] court should be guided by a balancing of the *Snow* objectives and in that context is required to take into account the attributes of youth, such as those described in *Miller*." *Id.* In *People v Snow*, 386 Mich 586; 194 NW2d 314 (1972), our Supreme Court noted "certain basic considerations [that] were found to be proper in determining an appropriate sentence:"

> (a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses. [*Id.*

at 592 citing *Williams v New York*, 337 US 241; 69 S Ct 1079; 93 L Ed 1337 (1949)].

"The process of properly balancing these objectives in the case of a minor defendant necessitates consideration of the distinctive attributes of youth." *Wines*, 323 Mich App at 351. However, our Supreme Court warned, "[t]his list is not exhaustive, and we do not purport to instruct the trial courts on every criterion which they must consider when imposing a sentence." *People v Coles*, 417 Mich 523, 550; 339 NW2d 440 (1983), holding mod by *Milbourn*, *supra*.

Here, the court explained its reasons for departure at defendant's sentencing:

As to Count 1, the court intends to depart from the guidelines of 120 to 300. The basis for that is that this is an absolutely horrendous predatory crime. I understand that the defendant claims that the first shot was a mistake when purportedly the victim pulled the gun or that when it was pulled, it was a mistake and he pulled the trigger. However, he then pulled the trigger five times and essential emptied the gun into the defendant [sic].

And based upon the testimony, this wasn't one of those things where it automatically goes off. It requires that the gun be—trigger be pulled five times after the chamber enters the round. And not only did the defendant pull it five times emptying the gun into the body of the deceased, he pulled it two extra times just to make sure that the gun was empty based upon his statement.

Then after the—after killing the victim in this crime, he went to Denny's, went to bed like nothing at all had happened. To me, that is the most disturbing part of this, to pull—pull a gun, pull the trigger five times, pull it two extra times to make sure that there was no more ammunition in there. But for the fact that there was no more, he would have been shot seven times or he would have been shot as many times as as [sic] many bullets were in that gun. He pulls it two extra times just to make sure the gun was empty.

After he did that, as a young person, didn't upset him, didn't go back, didn't have a nervous breakdown. What does he do? Goes out with two girls to Denny's, then goes to bed like nothing at all had happened. And that is a very disturbing comment as to this particular individual who is before the court.

This is a cold-blooded crime of opportunity. It's a predatory crime. Victim was led to an area which was somewhat secluded in the parking lot, a lot of trees as evidenced—and other cars as evidenced by the photographs which were admitted into evidence.

The other disturbing factor is that there was no prior relationship with these people. The victim just happened to be in the parking lot looking for directions, which is based upon the testimony, based upon the exhibits which were admitted in there. He had an address in the complex, he was looking for it, he was lost, and both this defendant and his co-defendant took the opportunity to commit this particular crime. Now, that is another very disturbing aspect of this particular case.

And as reflected by the verdicts, if you look at the verdicts in and of itself, the Felony Murder, which is a natural life, non-parolable offense, is Second Degree Murder plus the – or a felony during which a murder occurs or a murder occurring during the course of a felony. And in essence, if you look at this, basically that is – although the verdict did not come in as Felony Murder, it came in as Second Degree, you have a homicide which is committed during the course of a felony, that being armed robbery, which is, by definition, the same definition of Felony Murder.

Now, I know both sides are arguing as to what jurors said or what – you know, this was a compromise verdict, but regardless, that is the definition of Felony Murder which is provided in the rules that – and instructions that were given to the jury. Basically Felony Murder is Second Degree plus the – Second Degree Murder plus the commission of a felony. This would have been natural life without parole had they done so.

This is clearly a predatory crime. And based upon those reasons and based upon the evidence which is presented in this case, the court will depart from the guidelines and impose a sentence of 600 months to 840 months for those reasons.[1]

While defense counsel raised issues related to defendant's youth during allocution, the trial court did not cite *Snow* or consider its factors when it sentenced defendant. Remanding for resentencing on defendant's second-degree murder conviction is therefore appropriate for the court to properly balance the objectives articulated in *Snow* which will necessitate consideration of the distinctive attributes of defendant's youth. *Wines*, 323 Mich App at 351. In light of this decision, we find it unnecessary to address defendant's additional departure and offense variable challenges related to the second-degree murder sentence.

We do note however, defendant's concern over the trial court's consideration of defendant's acquitted charge of felony murder during sentencing. At the time defendant was sentenced, trial courts were permitted to consider conduct for which an offender was acquitted. See *People v Parr*, 197 Mich App 41, 46; 494 NW2d 768 (1992) ("A sentencing court may consider the facts underlying uncharged offenses, pending charges, and acquittals.") More recently, however, our Supreme Court decided in *People v Beck*, 504 Mich 605, 609; 939 NW2d 213 (2019), that "[o]nce acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." In *Beck*, the Court reasoned that when a jury has found "that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent" and that to allow the trial court to consider the same conduct at sentencing was fundamentally inconsistent with the presumption of innocence. *Id*. at 626-627. On remand, the trial court should take into account the Supreme Court's proscription in *Beck* regarding enhancing a sentence due to crimes for which the defendant has been acquitted.

---

[1] Defendant was resentenced two days later on February 16, 2000, to 552–840 months.

We affirm defendant's convictions. We also affirm defendant's sentences for assault with intent to rob while armed and felony firearm. We vacate defendant's sentence for second-degree murder and remand for resentencing on that conviction. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens