*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMES GREGORY EADS,

        Defendant-Appellant.

FOR PUBLICATION
January 16, 2025
12:13 PM

No. 357332
Wayne Circuit Court
LC No. 92-007359-01-FC

Before: MURRAY, P.J., and BORRELLO and MARIANI, JJ.

MARIANI, J.

In 1992, the defendant, James Gregory Eads, was found guilty of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for crimes he committed as a juvenile. The trial court sentenced Eads as an adult and, departing upward from the guidelines, imposed consecutive terms of 50 to 75 years' imprisonment for second-degree murder and two years' imprisonment for felony-firearm. Eads appeals as on leave granted[1] the trial court's order denying his motion for relief from judgment (MFRJ), arguing that, in light of *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and the legal developments that have followed, his sentence for second-degree murder is unconstitutional and disproportionate. We agree that Eads's term-of-years sentence for second-degree murder is invalid for two related but distinct reasons: it violates the Michigan Constitution's prohibition against cruel or unusual punishment, and it is also disproportionate given the sentencing court's failure to consider Eads's youth and its attendant characteristics as mitigating factors.[2] Accordingly, we reverse the trial court's order denying Eads's MFRJ, vacate Eads's

---

[1] Following this Court's denial of Eads's delayed application for leave to appeal, *People v Eads*, unpublished order of the Court of Appeals, entered July 19, 2021 (Docket No. 357332), our Supreme Court remanded this case as on leave granted, *People v Eads*, 512 Mich 918; 994 NW2d 493 (2023).

[2] Eads also raised in his MFRJ an as-applied equal-protection challenge to MCL 769.25 and MCL 769.25a. Given our disposition of this appeal, we need not reach that challenge.

sentence for second-degree murder, and remand to the trial court for resentencing consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In May 1992, Eads, then 16 years old, fatally shot 17-year-old Eric Kincaid, who at the time was wearing a shirt that clearly displayed his affiliation with a rival gang. Eads had fired several shots at a group of young men, including Kincaid, after they had gotten up from the porch of a home in Detroit and quickly approached the car in which Eads was a passenger. One of the bullets struck Kincaid in the chest, ultimately killing him. According to Eads, he fired the gun at the group because, given his "prior gang experience," he believed that the car "was being rushed by rival gang members" and that his "life was in danger." Eads was charged with first-degree murder, MCL 750.316, and felony-firearm, MCL 750.227b, for the shooting.[3] In October 1992, following a jury trial, Eads was found guilty of the lesser-included offense of second-degree murder and of felony-firearm.

A sentencing hearing was held in November 1992, shortly after Eads had turned 17 years old. Eads's recommended sentencing guidelines range for second-degree murder was a minimum term of 12 to 25 years' (144 to 300 months') imprisonment, or life. At the hearing, Kincaid's mother and sister provided victim impact statements. Kincaid's mother asked that Eads be incarcerated "until he's too old to reach society again," and his sister asked that the trial court sentence Eads to life imprisonment "for taking away [her] brother's" life. The following exchange then occurred:

> [*The Court*]: You understand under [a] life sentence, he would be eligible for parole in ten years in Michigan. You understand that?
>
> [*Kincaid's Sister*]: I thought second degree murder was mandatory life with [sic] parole.
>
> [*The Court*]: No, it's not . . . . First degree murder is mandatory life with no parole, but any other life sentence is he's eligible for parole after ten years. I want you to understand that.
>
> [*Kincaid's Sister*]: Okay. Well, I want you to make a fair decision. It's all up to you.

The prosecution asked that the trial court depart from the guidelines and sentence Eads as an adult to a term of 60 to 120 years' imprisonment because he was "a 17 year old individual [who] is nothing but a danger to other youths" and such a sentence was "appropriate" to "deter others

---

[3] First-degree murder is an enumerated crime set forth in MCL 600.606(2), so Eads's case was subject to MCL 764.27, which automatically waives jurisdiction for certain charges against juveniles from the family division of the circuit court to the general circuit court. MCL 764.27; MCL 600.606(1) and (2).

from behaviors that Mr. Eads demonstrated out there on the street" and to "protect the rest of us from his type."[4] Defense counsel stated that he agreed with the content of a letter submitted to the court by a clinical psychologist who had assessed Eads; given Eads's young age and traumatic upbringing,[5] the letter recommended, and defense counsel likewise requested, that Eads receive a lighter sentence and serve his time in a juvenile detention center. In his allocution, Eads explained that he had "lived on [his] own since [he] was 11 years old," when his father died, and he had become involved in a gang then because the gang "gave [him] a home when no one else would" and "[t]he only way for [him] to survive poverty and homelessness was through gang membership." He expressed that he had "come to realize that [the gang's] way of living was wrong" and wanted to "better [himself] so [he] can help other people out of gangs before it is too late." Eads apologized to Kincaid's family and asked the court to "be merciful enough to send [him] to a facility where [he] can receive an education" that he could then use to "serve [his] family and community by working to free them from a life that could only end with death or prison."

The trial court departed from the guidelines range and sentenced Eads as an adult to a term of 50 to 75 years' (600 to 900 months') imprisonment, to be served consecutively to a term of 2 years' imprisonment for felony-firearm. In imposing a departure sentence that was 300 months above—i.e., double—the maximum-minimum sentence under the guidelines, the court reasoned:

> I have never departed from the sentencing guidelines since they have been instituted, but I am going to depart from them in this case. If there was ever a crime that had no provocation at all to be committed, it's [Mr. Eads's]. I don't care if the man wore a T-shirt that said "Kill All Latin Counts" or "Kill James Gregory Eads." Shirts and words do not kill. He was driving by in a car. All he had to do was keep going. He didn't have to stop and do anything.
>
> So—and I do not accept the philosophy that a person is—people commit crimes because of their environment. Many people who come from the same environment of [Mr. Eads], the majority of them have remained law abiding citizens. That's not true . . . .
>
> \*  \*  \*
>
> I consider this to be the most unprovoked crime I've ever had in my 17 years as a judge. There's no provocation, there's no reason to have killed this person. Because they're wearing a shirt? How could you kill someone because they were wearing a shirt that is of a group that you dislike? I don't care what that shirt said. It could never be justification for killing anyone . . . .

---

[4] The prosecution also pointed to Eads's juvenile record prior to the instant offense, including a history of disruptive and dangerous behavior at juvenile facilities where he had been placed.

[5] The record indicates that Eads's father died when Eads was eleven years old and, for the years following, Eads suffered from depression, used alcohol and marijuana on a daily basis, and was chronically subjected to neglect, poverty, homelessness, and gang involvement.

* * *

[M]aybe [Mr. Eads] can be rehabilitated, but I think it takes . . . a long period of time, not just words—a long period of time under close supervision to develop the discipline and skills and self restraint that's needed in a civilized society like ours . . . .

* * *

I think that [the imposed sentence] gives Mr. Eads a chance for parole at an age where he would not be a danger to society. His life expectancy really now is 53.11 years. I really think he should not be out until he reaches about 50 years of age, and that would be the proper age for him to—if he's demonstrated he can survive and behave in a structured discipline.

After sentencing, Eads directly appealed his convictions and sentences, which this Court affirmed.[6] Our Supreme Court thereafter issued an order denying Eads's delayed application for leave to appeal.[7]

In January 2021, Eads filed the instant MFRJ under MCR 6.500 *et seq.* Eads argued in relevant part that, in light of *Miller*, he received an unconstitutional and disproportionate sentence for second-degree murder and was therefore entitled to resentencing because, in imposing a 50-year minimum sentence, the trial court failed to consider the mitigating factors of his youth and instead considered those mitigating factors as aggravating factors to justify the departure sentence.

In May 2021, the trial court denied Eads's MFRJ. Eads then filed a delayed application for leave to appeal, which this Court denied. *People v Eads*, unpublished order of the Court of Appeals, entered July 19, 2021 (Docket No. 357332). Eads then sought leave to appeal with our Supreme Court, which remanded the case to this Court "for consideration as on leave granted," with additional instructions that this Court "shall consider whether the defendant is entitled to relief under *People v Boykin*, 510 Mich 171; 987 NW2d 58 (2022), or *People v Stovall*, 510 Mich 301; 987 NW2d 85 (2022)." *People v Eads*, 512 Mich 918; 994 NW2d 493 (2023). We now take up these matters as instructed.

## II. STANDARD OF REVIEW

"We review a trial court's decision on a motion for relief from judgment for an abuse of discretion." *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). Sentencing decisions are also reviewed for an abuse of discretion. *Boykin*, 510 Mich at 182. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes or makes

---

[6] *People v Eads*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 1994 (Docket No. 160735).

[7] *People v Eads*, 450 Mich 865; 539 NW2d 377 (1995). On the order, three of the seven Justices were shown as favoring a remand for resentencing pursuant to *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

an error of law." *Swain*, 288 Mich App at 628-629 (citations omitted). Questions of constitutional law and statutory interpretation are reviewed de novo. *Boykin*, 510 Mich at 183.

## III. PROCEDURAL BARRIERS IN MCR 6.508(D)

The prosecution argues that Eads is not entitled to appellate relief because he has failed to overcome the procedural barriers set forth in MCR 6.508(D). We disagree.

A defendant who files a MFRJ under MCR 6.500 *et seq.* "has the burden of establishing entitlement to the relief requested." MCR 6.508(D). In some circumstances, this burden requires the defendant to surmount additional barriers beyond proving the substantive merit of their challenge. As is relevant here, if the defendant "alleges grounds for relief which were decided against the defendant in a prior appeal or [MFRJ] proceeding," then a court may not grant relief "unless the defendant establishes that a retroactive change in the law has undermined the prior decision[.]" MCR 6.508(D)(2). And if the defendant "alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior [MFRJ]," a court may not grant relief "unless the defendant demonstrates . . . good cause for failure to raise such grounds on appeal or in the prior motion" and "actual prejudice from the alleged irregularities that support the claim for relief." MCR 6.508(D)(3)(a)-(b).

Eads's challenges to his sentence survive the additional barriers to relief imposed by MCR 6.508(D)(2) and (3). Eads's challenge to his sentence as unconstitutionally cruel and/or unusual was not raised on direct appeal, but the fact that Eads's direct appeal occurred well before *Miller* and its progeny came into being is enough in itself to establish good cause under MCR 6.508(D)(3)(a) for failing to raise the challenge at that time. See *People v Poole*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 352569); slip op at 8-9. And to show actual prejudice under MCR 6.508(D)(3)(b), Eads must show that his "sentence is invalid," MCR 6.508(D)(3)(b)(*iv*), which he can do by prevailing on the merits of the challenge. See *Poole*, ___ Mich App at ___; slip op at 9. Eads's proportionality challenge was raised on direct appeal and is thus subject to MCR 6.508(D)(2), but he is not precluded from postjudgment relief on the issue because, as discussed *infra*, a retroactive change in the law—*Miller* and its progeny—undermines the prior sentencing decision. Accordingly, Eads can demonstrate entitlement to relief on that challenge by prevailing on its merits.

## IV. BACKGROUND PRINCIPLES REGARDING JUVENILE SENTENCING

Eads's constitutional and proportionality challenges stem from a common origin: the recognition, in both our state and federal jurisprudence, that youth matters in sentencing. We start with a brief review of the most immediately relevant aspects of that jurisprudence.

In *Miller*, the United States Supreme Court applied its rationale from *Roper*[8] and *Graham*[9] that juveniles "are constitutionally different from adults for purposes of sentencing" to hold "that mandatory life without parole [(LWOP)] for those under the age of 18 at the time of their crimes

---

[8] *Roper v Simmons*, 543 US 551, 570; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

[9] *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 US at 465, 471. In doing so, the Court emphasized that "juveniles have diminished culpability and greater prospects for reform" and that a sentencing court must have discretion to impose a lesser term-of-years sentence on a juvenile after considering such "mitigating qualities of youth." *Id.* at 471, 476 (quotation marks and citation omitted). The Court noted "three significant gaps between juveniles and adults": (1) juveniles "have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) juveniles "are more vulnerable to negative influences and outside pressures, including from their family and peers," have "limited control over their own environment," and "lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) a juvenile's "traits are less fixed" than those of an adult, and their actions are thus "less likely to be evidence of irretrievable depravity." *Id.* at 471 (quotation marks, citations, and alterations omitted). Four years later, the United States Supreme Court held in *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016), that *Miller* announced a substantive rule of constitutional law that applied retroactively to cases on collateral review.

Michigan law has evolved in the wake of *Miller*. The Michigan Legislature accounted for the decision by enacting MCL 769.25 and MCL 769.25a, which introduced a sentencing scheme that eliminated mandatory LWOP for all juveniles who were convicted of specific crimes, including first-degree murder.[10] And the Michigan Supreme Court has looked to and built upon *Miller*'s guiding principles in construing the law of this state with respect to the sentencing of juveniles. As our Supreme Court's remand instructions in this case make clear, its decisions in *Boykin* and *Stovall* are particularly relevant here.[11]

*Boykin* and its companion case, *People v Tate*, involved juvenile offenders who received sentences of 40 to 60 years' imprisonment under MCL 769.25 and MCL 769.25a for their

---

[10] Under this sentencing scheme, the default sentence for juveniles convicted of any one of the specified offenses is a term-of-years sentence, with a minimum sentence of not less than 25 years and not more than 40 years and a maximum sentence of not less than 60 years. MCL 769.25(9). Additionally, an individual who was convicted of a specified offense and sentenced to mandatory LWOP pre-*Miller* is entitled to resentencing to a term-of-years sentence, with a minimum of not less 25 years and not more than 40 years and a maximum of 60 years. MCL 769.25a(4)(c). Although LWOP is still a possibility under either statute, the prosecution is required to move for such a sentence. MCL 769.25(2)-(3); MCL 769.25a(4)(b). There are also certain procedural standards that must be met, including a requirement that the prosecution rebut, by clear and convincing evidence, the presumption that a sentence of LWOP is disproportionate. *People v Taylor*, 510 Mich 112, 134-136; 987 NW2d 132 (2022).

[11] We also note briefly the Court's decision in *People v Parks*, 510 Mich 225, 248, 268; 987 NW2d 161 (2022), which drew on *Miller*'s principles, as well as "the scientific and social-science research regarding the characteristics of the late-adolescent 18-year-old brain," to conclude that imposing mandatory LWOP on 18-year-old defendants convicted of first-degree murder—while not prohibited by the Eight Amendment under current federal precedent—"constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16."

convictions of first-degree murder.[12]  At issue was whether those term-of-years sentences were invalid because the respective sentencing courts failed to consider youth as a mitigating factor as required by *Miller*.  *Boykin*, 510 Mich at 179-180.  In remanding both cases to this Court for further consideration, our Supreme Court rejected the notion that *Miller*'s principles were limited to the LWOP context and instead held that, "when imposing a term-of-years sentence on a juvenile defendant . . . consideration of youth and its attendant circumstances is . . . required by this state's sentencing jurisprudence."  *Id*. at 188 (citation omitted).  Accordingly, sentencing courts must "consider the defendant's youth and must treat it as a mitigating factor" when sentencing a defendant to a term of years under MCL 769.25 or MCL 769.25a.  *Id*. at 189.

In so concluding, the *Boykin* Court emphasized that "[y]outh matters in sentencing decisions involving juvenile offenders, and the trial court is responsible for tailoring a sentence to an individual defendant and for giving reasons for imposing each sentence in order to facilitate appellate review."  *Id*. at 192.  The Court explained that, when imposing a sentence, a trial court must consider the "four basic sentencing considerations" provided in *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972): (1) "reformation of the offender," (2) "protection of society," (3) "disciplining of the wrongdoer," and (4) "deterrence of others from committing like offenses"—and a juvenile offender's sentence cannot adequately address these considerations without a trial court first "considering the mitigating factors of youth[.]"  *Boykin*, 510 Mich at 188-189 (quotation marks omitted); see also *id*. at 189 ("Given that youth is a mitigating factor, it will inevitably factor into *Snow*'s four considerations.").  That said, while a sentencing court must consider the mitigating factors of youth, "this consideration need not be articulated on the record," as "there is no authority that imposes a higher standard of articulation regarding youth beyond our general requirement that a trial court must adequately explain its sentence on the record in order to facilitate appellate review."  *Id*. at 193-194.

Decided on the same day as *Boykin* was *Stovall*, which involved a juvenile offender who, in 1992, received a sentence of life with the possibility of parole for his conviction of second-degree murder.  *Stovall*, 510 Mich at 308.  Our Supreme Court vacated the sentence and remanded for further proceedings, concluding that "a parolable life sentence for a defendant who commits second-degree murder while a juvenile" constitutes cruel or unusual punishment under Const 1963, art 1, § 16.  *Id*. at 322.  To reach this conclusion, the Court applied the four-part test from *People v Bullock*, 440 Mich 15, 30, 33-34; 485 NW2d 866 (1992), which assesses

> (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. [*Stovall*, 510 Mich at 314.]

---

[12] Boykin was convicted and sentenced in 2003 to mandatory LWOP for first-degree murder, but was subsequently resentenced in 2016 under MCL 769.25a.  *Boykin*, 510 Mich at 179-180.  Tate was convicted and sentenced in 2017 under MCL 769.25.  *Id*. at 182.

-7-

Regarding the first two *Bullock* factors, the *Stovall* Court noted that "a parolable life sentence is the most severe penalty that can be imposed for second-degree murder," that this penalty "is particularly severe when imposed on a juvenile, given the important mitigating ways that children are different from adults," and that this severity is only further "heightened by the fact" that juveniles convicted of second-degree murder do not receive the same "significant procedural safeguard[s]" guaranteed to juveniles convicted of first-degree murder by MCL 769.25 and MCL 769.25a "before being sentenced to die in prison." *Id*. at 314-316. Instead, the Court explained, a juvenile convicted of second-degree murder may receive the same, or even a more severe, sentence than a juvenile convicted of first-degree murder, but "with less process" and even though "they have been convicted of a *less* serious offense." *Id*. at 316-318. The Court emphasized, "When a sentence is not on the table for the most serious offense a juvenile can commit, permitting it for a less serious offense is disproportionate and therefore cruel or unusual." *Id*. at 316-317 (citation omitted).

As to the third *Bullock* factor, the *Stovall* Court concluded that it "support[ed] finding a parolable life sentence for a juvenile who commits second-degree murder to be cruel or unusual." *Id*. at 320. The Court cited to a plethora of statutes and caselaw in other jurisdictions, emphasizing that "there is a clear national trend toward treating juveniles less harshly than adults and extending *Miller* beyond just the mandatory LWOP context" and citing, in particular, cases that "all extend[ed] *Miller* to sentences that are de facto life sentences or the functional equivalent of LWOP." *Id*. at 318-319 (citations omitted). The Court further noted that many jurisdictions did not allow parolable life sentences for second-degree murder "for *anyone*, not just juveniles," and only instituted a term-of-years sentence not to exceed a certain length of time. *Id*. at 319-320 (citations omitted). Of all of the out-of-state punishments referenced, the highest maximum sentence allowed for second-degree murder was 60 years. See *id*.

And regarding the fourth *Bullock* factor, the *Stovall* Court concluded that it also supported a finding of unconstitutionality because a parolable life sentence for a juvenile convicted of second-degree murder does not provide the individual with "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 320 (quotation marks and citations omitted). The Court first noted that access "to educational and rehabilitative programming" was "vital" to juvenile offenders "to enhance their growth and rehabilitative potential," but "prisoners who receive parolable life sentences are given lower priority when it comes to" access to these programs. *Id*. at 320-321. The Court also noted that the Legislature had clearly demonstrated its intent that "a meaningful opportunity for release is generally available after 60 years" for a juvenile convicted of first-degree murder, and stated that "[i]t [did] not rationally follow that a meaningful opportunity for release for a juvenile convicted of second-degree murder could come after a longer period of incarceration than the maximum served by a juvenile convicted of first-degree murder." *Id*. at 321.

## V. CRUEL OR UNUSUAL PUNISHMENT

Turning to the merits of Eads's challenges, we first agree that he is entitled to relief under the Michigan Constitution's prohibition against cruel or unusual punishment.

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am

-8-

VIII." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). The Michigan Constitution, in this respect, contains broader language and correspondingly provides greater protection than the United States Constitution. *Stovall*, 510 Mich at 313-314.[13]

As discussed, our Supreme Court in *Stovall* has already made clear that a parolable life sentence is unconstitutionally cruel or unusual for a juvenile convicted of second-degree murder. In so concluding, the Court acknowledged that "[a] trial court could impose a long term-of-years sentence that would theoretically deprive a defendant of *any* chance of being paroled during their lifetime," but it expressly declined to opine "on whether a long term-of-years sentence imposed on a juvenile would violate Const 1963, art 1, § 16." *Id*. at 314 n 3. We conclude that, here, it does: while Eads received a long term-of-years sentence rather than life with the possibility of parole like the defendant in *Stovall*, we cannot find sound reason to deem his sentence constitutionally permissible when the parolable life sentence at issue in *Stovall* was not.

As in *Stovall*, our analysis is guided by the *Bullock* factors. Under the first and second of those factors, a term-of-years sentence of 50 to 75 years for a juvenile convicted of second-degree murder is an unduly severe penalty when compared to the gravity of the offense and the penalty imposed on other offenders in Michigan. See *id*. at 314-318. As noted by the *Stovall* Court, "second-degree murder is a grave offense," but "first-degree murder is almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan." *Id*. at 315, 317 (quotation marks, citation, and alterations omitted). Nonetheless, Eads is effectively serving a life sentence. Although Eads was formally sentenced to a term-of-years sentence of 50 to 75 years rather than life imprisonment, the United States Sentencing Commission (USSC) defines a life sentence as a period of incarceration of 470 months (approximately 39 years) or more—a period of incarceration well short of Eads's 50-year minimum, let alone his 75-year maximum.[14] Furthermore, a 2012 data report from the USSC "indicates that a person held in a general prison population has a life expectancy of about 64 years," although, as this Court has previously acknowledged, "[t]his estimate probably overstates the average life expectancy for minors committed to prison for lengthy terms." *People v Wines*, 323 Mich App 343, 351 n 6; 916 NW2d 855 (2018), rev'd in part on other grounds 506 Mich 954 (2020) (quotation marks and citations omitted). Indeed, the sentencing court in this case estimated Eads's life expectancy at the time of sentencing to be only 53 years of age or so. And even if we were to assume Eads's life expectancy to be 64 years of age—the same as an individual who enters prison as an adult, which he is not— Eads must serve a term of years requiring him to surpass this life expectancy before he may become

---

[13] Given our conclusion that Eads's sentence violates the Michigan Constitution, we need not reach the merits of his claim that it also violates the United States Constitution's narrower protection against cruel *and* unusual punishment.

[14] See United States Sentencing Commission (USSC), *2023 Sourcebook of Federal Sentencing Statistics*, Appendix A: Descriptions of Datafiles and Variables, p 170, available at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023_Sourcebook.pdf> (accessed January 13, 2025).

even *eligible* for parole for the first time.[15]  And of course, there is certainly no guarantee that Eads would be released on his first parole eligibility date, should he live long enough to see it.  See *id.* at 351.[16]

Not only is such a punishment "particularly severe when imposed on a juvenile, given the important mitigating ways that children are different from adults," *Stovall*, 510 Mich at 314-315, it is—and was designed to be—in some ways even harsher than the parolable life sentence deemed unconstitutional in *Stovall*.  As the trial court explained to Kincaid's sister at sentencing, imposing a life sentence would have meant that Eads would first become eligible for parole in ten years[17]; by opting for a lengthy term-of-years sentence instead, the court ensured that parole would not even become a potential option for him until decades later.[18]  Eads is now 49 years old and, by

---

[15] The estimated date for when Eads may be first eligible for parole is currently August 8, 2040, after he will have served approximately 48 years in prison.  See Michigan Department of Corrections (MDOC), Offender Tracking Information System <https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=227755> (accessed January 13, 2025).  The calculation of Eads's earliest release date includes disciplinary credit that he may or may not receive because MDOC has discretion to award and revoke disciplinary credit on a month-to-month basis.  See MCL 800.33(5).  Regardless, on August 8, 2040, Eads will be nearly 65 years old, which is beyond even the average life expectancy of an individual who enters prison as an adult and is thereafter held in a general prison population.  See *Wines*, 323 Mich App at 351 n 6.

[16] See also, e.g., MCL 791.233 and MCL 791.235 (granting discretion to the Parole Board to grant or deny a prisoner's parole); *People v Lockridge*, 498 Mich 358, 383-384; 870 NW2d 502 (2015), citing *Greenholtz v Inmates of Nebraska Penal & Correctional Complex*, 442 US 1, 7; 99 S Ct 2100; 60 L Ed 2d 668 (1979) (acknowledging "the general proposition that a defendant has no constitutional entitlement to be paroled").

[17] See MCL 791.234(4), as amended by 1992 PA 181.

[18] At sentencing, the trial court stated, "I really think [Mr. Eads] should not be out until he reaches about 50 years of age, and that would be the proper age for him to—if he's demonstrated he can survive and behave in a structured discipline."  This statement, on its face, seems to indicate that the trial court believed Eads could potentially be released by age 50, but at no point did the court explain the basis for that apparent belief or how it comported with the 52-year minimum sentence the court imposed.  It is possible that the court simply misspoke, or that the court believed Eads could reduce his minimum sentence through the accrual of disciplinary credits such that he could be eligible for release by age 50.  See MCL 800.33(5).  To the extent it was the latter, it seems the court was mistaken.  Eads could earn up to five "disciplinary credits" and up to two "special disciplinary credits" each month that he served time in prison for second-degree murder.  See MCL 791.233b(n), as amended by 1989 PA 252; MCL 800.33(3), (5), as amended by 1986 PA 322.  He was ineligible to receive such credits while he served 2 years for his felony-firearm conviction as it is not listed as an eligible offense.  See MCL 791.233b, as amended by 1989 PA 252.  Thus, even if Eads received the maximum possible disciplinary credits each month and never lost any credits for misconduct during that time, Eads would have to serve a minimum of 38.5 years'

virtue of the sentence the court chose to impose, is more likely to die in prison before even reaching parole eligibility for the first time than to actually obtain release in his lifetime.[19]

Moreover, as with the parolable life sentence at issue in *Stovall*, the severity of Eads's term-of-years sentence is only further heightened by its lack of procedural safeguards, which are available to those convicted of first-degree murder but not to those convicted of the less-serious offense of second-degree murder. See *Stovall*, 510 Mich at 315-318; see also generally *Boykin*, 510 Mich 171; MCL 769.25; MCL 769.25a. As noted by the *Stovall* Court, the "practical" realities of sentencing and parole are that a juvenile convicted of second-degree murder faces a sentence the same as or more severe than what is now given to most juveniles convicted of first-degree murder. See *Stovall*, 510 Mich at 316-318. A juvenile convicted of first-degree murder post-*Miller* faces, by default, a minimum sentence of 25 to no more than 40 years under MCL 769.25. See *id*. at 316. A juvenile convicted and sentenced for first-degree murder pre-*Miller* initially received a harsher sentence, but *Miller* and MCL 769.25a entitled the juvenile to resentencing such that he or she, by default, could not receive a term-of-years sentence with a minimum higher than 40 years or a maximum higher than 60 years. See MCL 769.25a(4)(c). Eads, on the other hand, received a sentence of 50 to 75 years' imprisonment—a minimum sentence *10 years* higher and a maximum sentence *15 years* higher than those statutory upper limits—for committing a *lesser* offense as a juvenile. See *Stovall*, 510 Mich at 316-317; see also MCL 769.25a(4)(c). And he received that sentence without any of the significant procedural safeguards that must be satisfied to exceed those statutory limits for first-degree murder. Eads was originally charged with first-degree murder but, ironically, he has fared worse than he would have if the jury had convicted him of that more severe offense. It would not be "on the table" for a juvenile convicted of first-degree

---

imprisonment for his second-degree murder conviction. See MCL 800.33(5). When factoring in his consecutive sentence of 2 years for felony-firearm and his 134 days for time served, Eads would have to serve slightly more than 40 years' imprisonment before even conceivably becoming eligible for parole for the first time—years past the court's own estimate of his life expectancy and (as the court made clear it knew full well) decades past when he would have first become eligible for parole had the court opted to impose a life sentence instead.

[19] This seems to be particularly likely in light of studies analyzing the effects of incarceration on life expectancy, which, as we have previously acknowledged, indicate that "inmate life expectancy is statistically low." *Wines*, 323 Mich App at 351. For instance, according to a 2013 study cited in *Wines*, *id*. at 351 n 6, "[e]ach additional year in prison produced a 15.6% increase in the odds of death for parolees, which translated to a 2-year decline in life expectancy for each year served in prison." Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 Am J of Pub Health 523, 523 (Mar 2013), available at <https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2012.301148> (accessed January 13, 2025). And a 2020 study analyzing the association between incarceration and mortality over a 40-year period found a 13% loss of life expectancy—approximately four to five years—in incarcerated individuals by time they reach 45 years of age. Daza et al., *The Consequences of Incarceration for Mortality in the United States*, 57(2) Demography 577, 591 (Mar 2020), available at <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7710643/> (accessed January 13, 2025).

murder to be sentenced as Eads has been; permitting such sentencing "for a less serious offense is disproportionate and therefore cruel or unusual." *Stovall*, 510 Mich at 316-317; see also MCL 769.25a(4)(c).

Regarding the third *Bullock* factor, for the same reasons cited in *Stovall*, the "trend toward treating juveniles less harshly than adults and extending *Miller* beyond just the mandatory LWOP context" likewise supports treating juveniles sentenced to a 50-to-75-year term-of-years sentence for second-degree murder less harshly than similarly situated adults. See *Stovall*, 510 Mich at 318-319 (collecting cases "extending *Miller* to sentences that are de facto life sentences or the functional equivalent of LWOP"). As duly noted by the *Stovall* Court, many jurisdictions favor a term-of-years sentence over parolable life sentences for everyone, "not just juveniles." *Id*. at 319. That said, none of the jurisdictions referenced in *Stovall* permitted a term-of-years sentence nearly as severe as Eads's. See *id*. at 319-320. Indeed, of the referenced jurisdictions, the only jurisdiction that came close to Eads's sentence was Tennessee, which provided a maximum sentence of 60 years. See *id*.; see also Tenn Code Ann 39-13-210 (providing that second-degree murder is a Class A felony); Tenn Code Ann 40-35-112 (providing that Class A felonies are subject to sentences of 15 to 60 years). All other referenced jurisdictions had a *maximum* term-of-years sentence that was the same as or shorter than Eads's *minimum* of 50 years' imprisonment. See *Stovall*, 510 Mich at 319-320.[20]

Finally, under the fourth *Bullock* factor, much of what has already been stated—in this opinion and in *Stovall*—leads to the conclusion that a term of 50 to 75 years' imprisonment for a juvenile offender convicted of second-degree murder does not provide the juvenile "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 320 (quotation marks and citations omitted). For juveniles convicted of first-degree murder, "such a meaningful opportunity for release is generally available after 60 years," the default statutory maximum for that offense. *Id*. at 321. Just as for a juvenile sentenced to parolable life, Eads's maximum sentence far exceeds that, and "[i]t does not rationally follow that a meaningful opportunity for release for a juvenile convicted of second-degree murder could come after a longer period of incarceration than the maximum served by a juvenile convicted of first-degree murder."

---

[20] See also, e.g., Ariz Rev Stat Ann 13-710 (providing for a minimum of 10 years and a maximum of 29 years for second-degree murder); Ark Code Ann 5-10-103 (providing that second-degree murder is a Class A felony) and Ark Code Ann 5-4-401 (providing that the punishment for Class A felonies is a determinate sentence of 6 to 30 years); Ga Code Ann 16-5-1 (providing for a 10- to 30-year sentence for second-degree murder); Iowa Code 707.3 (providing for a 50-year maximum sentence for second-degree murder); Md Code, Crim Law 2-204 (providing for a 40-year maximum sentence for second-degree murder); Minn Stat 609.19 (providing for a 40-year maximum sentence for second-degree murder); New Mex Stat Ann 30-2-1 (providing that second-degree murder is a second-degree felony resulting in the death of a human being) and New Mex Stat Ann 31-18-15(4) (setting the punishment for second-degree felonies at 15 years in prison); Va Code 18.2-32 (providing for a minimum sentence of five years and a maximum sentence of 40 years for second-degree murder); W Va Code 61-2-3 (providing for a 10- to 40-year sentence for second-degree murder).

*Id.* Moreover, "prisoners who receive parolable life sentences are given lower priority when it comes to educational and rehabilitative programming," which are particularly "vital" to juveniles "to enhance their growth and rehabilitative potential." *Id*. at 320-321. The same holds true for juveniles, such as Eads, who have been sentenced to a lengthy term-of-years sentence. For instance, "[p]risoners sentenced for a crime committed on or before December 15, 1998" and "prisoners with . . . long indeterminate sentences"—of which Eads is both—sit alongside "prisoners . . . with life sentences" at the very bottom of the Michigan Department of Corrections' (MDOC) priority list for placement in academic programming.[21] Similarly, for placement in career-and-technical-education programming, lowest priority is given to those who "are serving a life sentence" or who are—as someone like Eads will be until they have nearly reached, if not already exceeded, their life expectancy—"more than 24 months to their [Earliest Release Date (ERD)/Parole Board Jurisdiction (PBJ)] date."[22] Given the length of his sentence, we cannot conclude that Eads stands to receive any more meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation than a juvenile sentenced to parolable life. See *Stovall*, 510 Mich at 320-321.

Overall, we fail to see how Eads's 50-to-75-year term-of-years sentence for second-degree murder could pass muster under the Michigan Constitution's prohibition against cruel or unusual punishment, when the parolable life sentence at issue in *Stovall* could not. Accordingly, we conclude that Eads's sentence is unconstitutional and he is entitled to resentencing.[23]

---

[21] MDOC, *Policy Directive No. 05.02.112, In re: Education Programs for Prisoners, effective April 5, 2021*, pp 4-5 available at <https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Policy-Directives/PDs-05-Institutional-Placement-and-Programs/PD-0502-Education-and-Work-Assignments/05-02-112-Education-Programs-for-Prisoners-effective-04-05-21.pdf?rev=89650e96c4d044efa80499b4cfb6264d> (accessed January 13, 2025).

[22] *Id.* at p 7. The availability of and prioritization for other programming is similarly based upon a prisoner's proximity to their ERD/PBJ date. See, e.g., *id*. (providing that, to access certain transitional services such as employment-readiness programming, prisoners must be within five years of their ERD/PRB date, with priority given to those within six months of that date); see also, e.g., MDOC, *Policy Directive No. 05.01.100, In re: Prisoner Program Classification, effective July 17, 2023*, p 1 available at <https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Policy-Directives/PDs-05-Institutional-Placement-and-Programs/PD-0501-Evaluation-Classification-Placement/05-01-100-Prisoner-Program-Classification-effective-12-02-19.pdf?rev=879b48a1dde84cbdaa13b75157acdb78> (accessed January 13, 2025) (providing that prisoner placement into core rehabilitative and educational programs shall be prioritized by PBJ date).

[23] The dissent posits that it is incorrect to rely on *Bullock* and *Stovall* in analyzing whether Eads's term-of-years sentence is unconstitutionally cruel or unusual. We fail to see, under the law or otherwise, why the considerations outlined in *Bullock* would properly inform an analysis of the cruel or unusual nature of a court's choice of one legislatively authorized punishment for second-degree murder—parolable life—but not its choice of another—a term of years of any length. See

## VI.  PROPORTIONAL AND INDIVIDUALIZED SENTENCING

We also conclude that Eads is entitled to relief on his related but distinct proportionality challenge to his sentence.  See, e.g., *Bullock*, 440 Mich at 34 n 17 (noting that, "although the concepts share common roots," whether a punishment is so disproportionate as to be unconstitutionally cruel or unusual is legally distinct from whether it violates "the nonconstitutional 'principle of proportionality' discussed in *People v Milbourn*, 435 Mich 630, 650; 461 NW2d 1 (1990)").

For many of the substantive reasons already discussed, a term of 50 to 75 years' imprisonment is disproportionate to Eads and the circumstances surrounding his offense given his status as a juvenile at the time that he committed the offense and the inherent, constitutionally significant differences between juveniles and adults for purposes of sentencing.  Under the principle of proportionality, Eads was entitled to be sentenced in a manner that duly accounted for the individualized circumstances of the offender and offense.  See *Milbourn*, 435 Mich at 651. And as *Miller* and its progeny have now made clear, such circumstances include mitigating considerations related to his youth.  See *Boykin*, 510 Mich at 192 ("Youth matters in sentencing decisions involving juvenile offenders, and the trial court is responsible for tailoring a sentence to an individual defendant and for giving reasons for imposing each sentence in order to facilitate appellate review."); see also *Miller*, 567 US at 465, 471, 476 (recognizing that, because "juveniles have diminished culpability and greater prospects for reform," a sentencing court must consider "mitigating qualities of youth").  As explained in *Boykin*, 510 Mich at 188-189, "because the [United States] Supreme Court has held that youth—a circumstance of the offender—matters at sentencing, our own caselaw requires that such a relevant offender characteristic must be considered at sentencing," and "[g]iven that youth is a mitigating factor, it will inevitably factor into *Snow*'s four [proportionality] considerations."  See also *id.* (explaining the mitigating effects of youth and its attendant characteristics on each of the four considerations).

In light of *Miller* and its progeny, Eads's sentence lacks the requisite proportionality.  As previously detailed, Eads, despite his juvenile status and all that has now been recognized to come with it, received a sentence for second-degree murder that would require him to outlive his life

---

MCL 750.317 (providing that second-degree murder "shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same").  Nor does *Bullock*'s absence from *Boykin* suggest otherwise, as *Boykin* did not purport to analyze whether a sentence was unconstitutionally cruel or unusual, but instead—like the challenge addressed next in Section VI of this opinion—whether it comported with our state's nonconstitutional principle of proportionality. Furthermore, while the *Bullock* factors provide an apt framework for discerning the unconstitutionality of Eads's sentence under Const 1963, art 1, § 16, they are not what make it so.  Regardless of whether we are bound by that framework—and regardless, for that matter, of whatever our own personal views of Eads's sentence may be—it remains the case that (1) *Stovall* declared parolable life a categorically unconstitutional punishment for juvenile offenders such as Eads, and (2) we cannot find sound reason to deem the punishment Eads received, given its nature and severity, permissible under Const 1963, art 1, § 16 when the punishment at issue in *Stovall* was not.

expectancy before even becoming eligible for parole and would deny him a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Indeed, the sentence is, in purpose and effect, even more severe in some respects than the life-sentence alternative that our Supreme Court has now deemed so disproportionate as to be categorically unconstitutional for juvenile offenders such as Eads. See *Stovall*, 510 Mich at 322. We cannot conclude that such a sentence nonetheless meets our state's proportionality requirement.

Furthermore, while a trial court is not obligated to "give a detailed on-the-record explanation" regarding each of the *Miller* factors when imposing its sentence, *Boykin*, 510 Mich at 192, it is clear from the existing record that the court in this case did not consider Eads's youth and its attendant characteristics as potentially *mitigating* factors. In justifying its sentence, the court described the murder as "the most unprovoked crime" it had ever seen, emphasizing that a phrase on a t-shirt "could never be justification for killing anyone." The court openly acknowledged that Eads's background and the circumstances of the murder demonstrated that Eads was immature and impulsive, lacked discipline and self-restraint, and had been negatively influenced by gang members from a young age. Such observations reflect the very "characteristics of youth" that a sentencing court must consider as potentially mitigating the sentencing offense. See *id.* at 188-189; *Miller*, 567 US at 471-473, 476; see also *People v Parks*, 510 Mich 225, 250-251; 987 NW2d 161 (2022) (discussing how young adults, as a matter of cognitive development, "are hampered in their ability to make decisions, exercise self-control, appreciate risks or consequences, feel fear, and plan ahead"; are "characterized by impulsivity, recklessness, and risk-taking"; and are "more susceptible to negative outside influences, including peer pressure"). The trial court, however, dismissed the very notion that such characteristics might have a mitigating effect and instead considered them as *aggravating* factors in support of a significant departure sentence—an approach plainly contrary to *Miller* and its progeny. See *Boykin*, 510 Mich at 195 ("[Y]outh is a *mitigating* factor at sentencing, not an aggravating factor."); *People v Taylor*, 510 Mich 112, 139 n 25; 987 NW2d 132 (2022) ("We caution the trial courts to ensure that the *Miller* factors are not used as aggravators.").

Accordingly, Eads's sentence is invalid for lack of proportionality, and he is entitled to resentencing on that basis as well.

## VII. CONCLUSION

For the reasons discussed, *Miller* and its progeny have rendered Eads's term-of-years sentence invalid under both the Michigan Constitution and our state's proportionality requirement. He is entitled to be resentenced in a manner that comports with this jurisprudence and duly accounts for his youth and its attendant characteristics at the time he committed the offense at issue. The trial court's order denying Eads's MFRJ is reversed, Eads's sentence for second-degree murder is vacated, and this matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Philip P. Mariani
/s/ Stephen L. Borrello

-15-